# IN THE SUPREME COURT OF CALIFORNIA

LOS ANGELES POLICE PROTECTIVE LEAGUE,
Plaintiff and Respondent,

v.

CITY OF LOS ANGELES et al.,
Defendants and Appellants.

S275272

Second Appellate District, Division Seven
B306321

Los Angeles County Superior Court
BC676283

---

November 10, 2025

Justice Groban authored the opinion of the Court, Chief Justice Guerrero and Justices Corrigan, Kruger, Evans, and Jenkins[*] concurred.

Justice Liu filed a dissenting opinion.

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LOS ANGELES POLICE PROTECTIVE LEAGUE

v. CITY OF LOS ANGELES

S275272


Opinion of the Court by Groban, J.


California requires law enforcement agencies to investigate complaints against peace officers.  (See Pen. Code, § 832.5, subd. (a)(1).)  Penal Code section 148.6, subdivision (a) (section 148.6(a))[1] makes it a crime to file a knowingly false allegation of misconduct against a peace officer.  (See § 148.6, subd. (a)(1) [section 148.6(a)(1) or subdivision (a)(1)].)  The statute also mandates that before accepting a complaint, law enforcement agencies must require the complainant to read and sign an advisory informing the complainant that filing a knowingly false complaint of police misconduct is a crime.  (§ 148.6, subd. (a)(2) [section 148.6(a)(2) or subdivision (a)(2)].)  The issue presented in this case is whether section 148.6(a)'s provisions violate constitutional free speech rights.  We conclude that they do.

This is not the first time we have considered this issue.  In *People v. Stanistreet* (2002) 29 Cal.4th 497 (*Stanistreet*), the defendants argued that section 148.6(a) violated the rule set forth in *R. A. V. v. St. Paul* (1992) 505 U.S. 377 (*R. A. V.*), which generally requires that courts apply heightened scrutiny to regulations that discriminate on the basis of content within a

_____

[1]    Except where noted, all further statutory citations are to the Penal Code.

1

proscribable category of speech. (See *Stanistreet*, at p. 507.) More specifically, the defendants argued that heightened scrutiny was warranted under *R. A. V.* because section 148.6(a) "appl[ied] one defamation rule to citizen complaints against peace officers, and a different rule to those made against other public officials." (*Stanistreet*, at p. 507.) We agreed that section 148.6(a) constituted a content-based regulation within a proscribable category of speech, which we described as "knowingly false statements of fact." (*Stanistreet*, at p. 508.) We concluded, however, that the statute fell within various categories of content discrimination within a proscribable class that *R. A. V.* had recognized as generally permissible.

After *Stanistreet* was decided, multiple federal decisions rejected its analysis and held that section 148.6(a) violated the First Amendment. (See *Chaker v. Crogan* (9th Cir. 2005) 428 F.3d 1215 (*Chaker*); *Hamilton v. City of San Bernardino* (C.D.Cal. 2004) 325 F.Supp.2d 1087, 1091 (*Hamilton II*);[2] accord *Eakins v. Nevada* (D.Nev. 2002) 219 F.Supp.2d 1113 (*Eakins*) [adopting *Hamilton I*'s reasoning in striking down Nevada statute making it a misdemeanor to file knowingly false allegations of misconduct against a peace officer].) In the wake of those decisions, the City of Los Angeles (the City) entered into a consent decree barring it from requiring complainants to sign

---

[2]    The district court issued two published opinions in the *Hamilton* matter, both of which are cited in this opinion. The first opinion denied the City of San Bernardino's motion to dismiss the plaintiff's constitutional challenge to section 148.6(a) (see *Hamilton v. City of San Bernardino* (C.D.Cal. 2000) 107 F.Supp.2d 1239 (*Hamilton I*), while the second granted the plaintiff's motion for summary judgment on that claim (see *Hamilton II, supra,* 325 F.Supp.2d 1087).

the advisory described in section 148.6(a)(2). The consent decree expired in 2013, but the City still does not require a signed advisory from complainants.

In 2017, the Los Angeles Police Protective League (LAPPL) filed the current action seeking an injunction that would require the City to comply with section 148.6(a)(2)'s advisory requirement. Relying on the reasoning of the federal authorities cited above, the City argued that section 148.6(a) was an unconstitutional regulation of speech. The trial court concluded it was bound by *Stanistreet* and enjoined the City from accepting any complaint alleging misconduct by a peace officer unless the complainant had signed the advisory required by section 148.6(a)(2). The Court of Appeal affirmed, concluding (as the trial court had) that it was bound by *Stanistreet*. (See *Los Angeles Police Protective League v. City of Los Angeles* (2022) 78 Cal.App.5th 1081, 1088.) As a result of the ruling, the City was ordered to advise complainants that it was a crime to file a knowingly false claim of misconduct against a peace officer despite the fact that multiple federal decisions had found that criminal provision to be unconstitutional. The City petitioned for review, arguing that *Chaker* and other intervening federal decisions cast doubt on *Stanistreet*'s reasoning. We granted review.

In the intervening years since *Stanistreet* was decided, the United States Supreme Court has issued additional guidance on First Amendment issues that relate both to *R. A. V.* and, more generally, prohibitions on knowing falsehoods. This new guidance compels us to reconsider our decision in *Stanistreet*. In *Davenport v. Washington Educ. Ass'n* (2007) 551 U.S. 177 (*Davenport*), the court discussed when speech restrictions that

fall outside " 'the general prohibition' " (*id.* at p. 188) on content-based regulations may nonetheless warrant heightened constitutional scrutiny. The court's analysis indicates that when content-based regulation occurs within a proscribable class, the key inquiry is whether the statute risks "impermissibly distort[ing] the marketplace of ideas" (*id.* at p. 189) by " ' "driv[ing] certain ideas or viewpoints" ' " from the public sphere (*id.* at p. 188; accord *R. A. V., supra,* 505 U.S. at pp. 387–388). And in *United States. v. Alvarez* (2012) 567 U.S. 709 (*Alvarez*), the court announced for the first time that even well-intentioned prohibitions on knowing falsehoods can trigger heightened constitutional scrutiny if they go too far in chilling protected speech. (See *id.* at pp. 709, 723, plur. opn. of Kennedy, J. [criminal statute that targets "falsity and nothing more" would risk "cast[ing] a chill [on speech that] the First Amendment cannot permit"]; *id.* at p. 736, conc. opn. of Breyer, J. [statute criminalizing any knowingly false claim of receiving military award raised sufficient "risk of chilling" to warrant heightened scrutiny].) Most recently, in *Free Speech Coalition, Inc. v. Paxton* (2025) 606 U.S. 461 (*Free Speech Coalition*), the court held that content-based restrictions that regulate unprotected speech are subject to heightened constitutional scrutiny if they have an "incidental burden" on protected speech. (*Id.* at p. 495; see *id.* at pp. 482–483.)[3]

---

[3] The United States Supreme Court decided *Free Speech Coalition* shortly after we held oral argument in this matter. We vacated submission and directed the parties to submit supplemental briefing addressing the effect, if any, of *Free Speech Coalition* on the issues here.

The fundamental principle we derive from these subsequent cases, read in conjunction with *R. A. V.*, is that when assessing a statute like section 148.6(a) — which discriminates on the basis of content within a proscribable class of falsity (defamation) — courts must evaluate whether the risk of " 'driv[ing] certain ideas or viewpoints' " (*R. A. V.*, *supra*, 505 U.S. at p. 387) from the public sphere is so "inconsequential" (*Davenport*, *supra*, 551 U.S. at p. 188) that no further constitutional scrutiny is warranted. Stated differently, courts should ask whether the content-based regulation of proscribable speech is structured in such a manner that it either disfavors certain subjects or viewpoints (as in *R. A. V.*) or burdens protected forms of speech (as in *Alvarez* and *Free Speech Coalition*).[4]

---

[4]  As discussed in more detail below, *R. A. V.* concluded that the statute at issue in that case risked driving out certain viewpoints by criminalizing hate speech made in connection with certain topics (race, religion and gender), while leaving unregulated hate speech pertaining to any other topics (such as political affiliation or sexual orientation). Although the statute did not burden any form of protected speech (as all forms of hate speech are unprotected), the court reasoned that heightened scrutiny was warranted because it imposed "special prohibitions on those speakers who express views on disfavored subjects." (*R. A. V.*, *supra*, 505 U.S. at p. 391.) In this case, however, we focus not on whether section 148.6(a) impermissibly targets defamatory speech on disfavored topics, but rather whether the statute risks driving out certain viewpoints or ideas by regulating a subset of defamation in a manner that sufficiently burdens protected speech so as to warrant heightened scrutiny. (See *Free Speech Coalition, supra*, 606 U.S. at pp. 482–483; *Alvarez, supra*, 567 U.S. at pp. 709, 723, plur. opn. of Kennedy, J.; *id.* at p. 736, conc. opn. of Breyer, J.)

Applying those principles here, we conclude that section 148.6(a)'s criminal provision (§ 148.6(a)(1)) and its accompanying admonition requirement (§ 148.6(a)(2)) exhibit numerous characteristics that, considered together, sufficiently burden a protected form of speech — namely, truthful (or at least well-intentioned) complaints of police misconduct — so as to warrant heightened constitutional scrutiny. Those features include: (1) singling out for criminal treatment knowingly false allegations of misconduct that are filed against a category of government official whose job duties are of particular concern to the public; (2) asymmetrically criminalizing knowingly false allegations that are filed against law enforcement, while leaving unregulated false statements that witnesses might make in support of law enforcement during the course of the ensuing investigation that is required under section 832.5; (3) barring law enforcement from accepting a formal complaint of police misconduct unless complainants agree to read and sign an admonition warning that they can be criminally prosecuted if their claims are disbelieved; (4) providing complainants ill-defined and inconsistent descriptions of what specific types of false statements might trigger criminal liability; and (5) failing to require that the statements actually be material to an actionable type of misconduct or that they cause any harm to the falsely accused. (See *post*, at pp. 38–48.) While we express no view whether any of these elements might unduly burden speech when considered in isolation, we think it clear that, considered together, they "threaten censorship of ideas" (*R. A. V.*, *supra*, 505 U.S. at p. 393) by deterring citizens from filing truthful (or at least not knowingly false) complaints of police misconduct.

There is still a question under United States Supreme Court jurisprudence as to whether strict or intermediate scrutiny should apply to a content-based regulation like section 148.6(a), which discriminates within a proscribable class of knowing falsehoods (defamation) in a manner that incidentally burdens protected speech. (Compare *R. A. V.*, *supra*, 505 U.S. at p. 395 [applying strict scrutiny to a *viewpoint*-based regulation that discriminated within a proscribable class of speech] with *Free Speech Coalition*, *supra*, 606 U.S. at pp. 482–483 [content-based restrictions that regulate unprotected speech but incidentally burden protected speech are subject to intermediate scrutiny]; compare *Alvarez*, *supra*, 567 U.S. at p. 724, plur. opn. of Kennedy, J. [certain forms of regulations on false statements of fact should be subject to strict scrutiny] with *id.* at pp. 730–731, conc. opn. of Breyer, J. [restrictions on false statements of fact should generally be reviewed under intermediate scrutiny].) For the purposes of this case, however, we need not resolve that question because we conclude that section 148.6(a) cannot survive even the less exacting standard of intermediate scrutiny, which requires that "a law must be 'narrowly tailored to serve a significant governmental interest.'" (*Packingham v. North Carolina* (2017) 582 U.S. 98, 105–106 (*Packingham*).)

Applying that test here, we conclude that while the Legislature had a legitimate and significant interest in remedying the harmful effects of abusive false claims of police misconduct, section 148.6(a) is not narrowly tailored to meet those objectives. Instead, the statute establishes an ill-defined, asymmetrical criminal provision (see § 148.6(a)(1)) that is accompanied by an unusual admonition requirement. Considered together, those elements "create[] a potent

disincentive for citizens to file" even well-intentioned complaints of police misconduct. (*Hamilton II, supra,* 325 F.Supp.2d at p. 1094.) Thus, while we reaffirm *Stanistreet*'s conclusion that the Legislature is authorized to take steps to protect the integrity of the peace officer complaint process (see *Stanistreet, supra,* 29 Cal.4th at p. 510), we part ways with *Stanistreet* by now concluding that, as presently drafted, section 148.6(a) " 'burdens substantially more speech than is necessary to further the government's legitimate interests.' " (*Packingham, supra,* 582 U.S. at p. 105 [describing intermediate scrutiny standard].)

## I. BACKGROUND

### A. Regulation of Complaints Against Peace Officers

Section 832.5 requires "[e]ach department . . . that employs peace officers" to "establish a procedure to investigate complaints by members of the public against the personnel of these departments . . . , and . . . [to] make a written description of the procedure available to the public." (§ 832.5, subd. (a)(1).) The statute further requires that "[c]omplaints and any reports or findings relating to these complaints . . . shall be retained for a period of no less than 5 years." (*Id.,* subd. (b).) Complaints "that are determined . . . to be frivolous, . . . or unfounded or exonerated" are not to be retained in the officer's general personnel file (*id.,* subd. (c)) and "shall not [be] use[d] . . . for punitive or promotional purposes" (*id.,* subd. (c)(2)).

The Penal Code provision at issue in this case, section 148.6(a), makes it a misdemeanor for any person to "file[] any allegation of misconduct against any peace officer . . . knowing the allegation to be false." (§ 148.6(a)(1).) The statute

separately provides that any law enforcement agency accepting an allegation of misconduct against a peace officer "shall require the complainant to read and sign" an advisory explaining that California provides citizens "the right to make a complaint against a police officer for any improper police conduct" and requires law enforcement agencies to investigate such complaints. (§ 148.6(a)(2), all caps and boldface omitted.) The admonition goes on to warn the complainant that "it is against the law to make a complaint that you know to be false. If you make a complaint against an officer knowing that it is false, you can be prosecuted . . . ." (*Ibid.*, all caps and boldface omitted.) The statute further mandates that the advisory shall be written in all capital letters and boldface. (*Ibid.*)[5]

---

[5]     Section 148.6(a)(2) requires that the admonition include the following language:

"**YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER FOR ANY IMPROPER POLICE CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CIVILIAN' COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CIVILIAN COMPLAINTS AND ANY REPORTS OR FINDINGS RELATED TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS. [¶] IT IS AGAINST THE**

Prior to section 148.6(a)'s enactment, a different statute "made (and still makes) it a misdemeanor to report a felony or misdemeanor knowing the report to be false. (§ 148.5.) However, . . . courts had interpreted section 148.5 as not applying to complaints of police misconduct from members of the public. [Citations.] The Legislature enacted section 148.6 to fill this gap." (*Stanistreet, supra*, 29 Cal.4th at p. 502.) Section 148.6(a), however, "does not merely extend section 148.5's protection to peace officers. Section 148.5 applies only to knowingly false reports 'that a felony or misdemeanor has been committed,' i.e., to reports of a *criminal* offense. By contrast, section 148.6 applies to all 'citizens' complaints of police misconduct during the performance of an officer's duties that may or may not rise to the level of a criminal offense.' " (*Stanistreet*, at p. 503.)

The legislative materials accompanying the assembly bill that added section 148.6(a) explained that "[s]ince the Rodney King incident in March 1991, law enforcement agencies throughout the state have revised their citizen complaint procedures to promote greater accountability on the part of their line officers. [¶] . . . [One] glaringly negative side-effect which has resulted has been the willingness on the part of many of our less ethical citizens to maliciously file false allegations of misconduct against officers in an effort to punish them for simply doing their jobs. [¶] Unfortunately for the officers, these complainants usually become a permanent part of their

LAW TO MAKE A COMPLAINT THAT YOU KNOW TO BE FALSE. IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE PROSECUTED ON A MISDEMEANOR CHARGE."

personnel jackets. . . . [M]ost of the officers find they have very little recourse against the complaints."[6] (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1732 (1995–1996 Reg. Sess.) April 18, 1995, at p. 1 (Assem. Com. on Public Safety Analysis); see *Stanistreet*, *supra*, 29 Cal.4th at pp. 502–503.)

The arguments in favor of the bill similarly explained that section 148.6(a) would "finally address[] the issue of knowingly making false allegations of misconduct against any peace officer. These false accusations can adversely affect the officer's position within the Department, and this legislation will discourage such false reports. [¶] . . . [¶] Yearly hundreds of unfounded and false complaints are filed against Peace Officers. In the Los Angeles County Sheriff's Department alone, over 500 complaints were received of which approximately 60 to 70% were unfounded. [¶] This bill will help prevent frivolous complaints which can affect the individual officer's future. For example, a Deputy Sheriff on a list for promotion to Sergeant receives a false report of misconduct, after which his promotion is deferred until the matter is resolved. After which, the complaint being found unfounded, the Deputy has no recourse for any financial loss due

---

[6] The legislative history of section 148.6(a) does not explain how law enforcement agencies had "revised their citizen complaint procedures to promote greater accountability on the part of their line officers." (Assem. Com. on Public Safety Analysis, *supra*, at p. 1.) Whatever the nature of the revisions, it appears that such changes were not compelled by section 832.5. That statute was originally passed in 1974 and remained in its original form when section 148.6(a) was enacted.

to the delay." (Assem. Com. on Public Safety Analysis, *supra*, at p. 2.)

Although not mentioned in the reports before the Legislature, several enrolled bill reports stated that section 148.6(a) would also save "department resources and time by not having to investigate unfounded complaints." (Dep. of Forestry and Fire Protection, Enrolled Bill Rep. on Assem. Bill No. 1732 (1995–1996 Reg. Sess.) Sept. 8, 1995, p. 1; see Dep. Parks and Recreation, Enrolled Bill Rep. on Assem. Bill No. 1732 (1995–1996 Reg. Sess.) Sept. 8, 1995, p. 1; Governor's Office of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 1732 (1995–1996 Reg. Sess.) Sept. 8, 1995, p. 2.)

## B. Procedural History

As discussed in more detail below, in *Stanistreet*, *supra*, 29 Cal.4th 497, we ruled that section 148.6(a) did not violate the First Amendment because it fell within each of the categories that *R. A. V.* had identified as permissible forms of content-based regulation within a proscribable category of speech. Two years after we decided *Stanistreet*, a federal district court expressly rejected our analysis and held that section 148.6(a) "does not come within the . . . *R. A. V.* categories of permissible content-based subclass regulation" and was thus "unconstitutional in violation of the First Amendment." (*Hamilton II*, *supra*, 325 F.Supp.2d at p. 1091; accord *Eakins*, *supra*, 219 F.Supp.2d 1113.) The United States Court of Appeals for the Ninth Circuit shortly followed suit, reasoning that section 148.6(a)(1) unlawfully discriminated on the basis of viewpoint by criminalizing knowingly false speech that is critical of police officers while leaving unregulated knowingly false speech that is supportive of police officers. (See *Chaker*,

*supra*, 428 F.3d at p. 1227 ["The imbalance generated by section 148.6 — i.e., only individuals *critical* of peace officers are subject to liability and not those who are supportive — . . . turns the First Amendment on its head"].)

Following those federal decisions, the City entered into a consent decree with the federal government that prevented the City from enforcing the advisory requirement set forth in section 148.6(a)(2). After the decree expired in 2013, the City — presumably concerned about *Chaker*'s holding that section 148.6(a)(1)'s criminal provision was unconstitutional — continued not to comply with the admonition requirement. In 2017, the LAPPL filed the current action against the City, which seeks an injunction requiring it to comply with section 148.6(a)(2)'s advisory requirement. Concluding that it was bound by *Stanistreet*, the trial court entered judgment in favor of the LAPPL and enjoined the City from accepting any complaint alleging misconduct by a peace officer unless the complainant has signed the advisory described in section 148.6(a)(2). The Court of Appeal affirmed. We granted review.

## II.   DISCUSSION

The City argues that *Chaker, supra*, 428 F.3d 1215, and other intervening federal authorities cast doubt on the continuing validity of *Stanistreet*.[7] As discussed below, while we apply different reasoning than the *Chaker* court, we agree that

---

[7]    In challenging the constitutionality of section 148.6(a), the City appears to rely solely on the free speech clause set forth in the First Amendment of the federal Constitution; it has not raised any argument that the California Constitution provides a separate basis of relief.

subsequent developments in the law warrant a reconsideration of our holding in *Stanistreet*.

### A. Relevant Case Law

In order to understand the complex First Amendment issues presented in this case, it is necessary to review the series of cases that preceded the challenge before us.

#### 1. *R. A. V.* v. City of St. Paul

In *R. A. V.*, *supra*, 505 U.S. 377, the Supreme Court considered a constitutional challenge to a City of St. Paul ordinance that made it a crime to display a symbol " 'which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others *on the basis of race, color, creed, religion or gender.*' " (*Id.* at p. 380, italics added.) The Minnesota Supreme Court had previously construed the ordinance as reaching only "fighting words," a well-established category of unprotected speech.

In its analysis, the Supreme Court accepted the state court's conclusion that the statute only reached speech that amounted to fighting words. The court explained, however, that even those "limited" categories of speech that may be subjected to regulation (fighting words, defamation, obscenity, fraud, etc.) are not "entirely invisible to the Constitution." (*R. A. V.*, *supra*, 505 U.S. at p. 383.) *R. A. V.* established a general rule that "while certain categories of speech . . . may be regulated, such regulation may not discriminate *within that category* on the basis of content." (*Stanistreet*, *supra*, 26 Cal.4th at p. 507.) Thus, for example, "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." (*R. A. V.*, at p. 384.)

Critically, however, the court went on to explain that the First Amendment's general prohibition against content discrimination "applies differently in the context of proscribable speech than in the area of fully protected speech." (*R. A. V.*, *supra*, 505 U.S. at p. 387.) According to the court, while the "rationale of the general prohibition . . . is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace,' [citations] . . . content discrimination among various instances of a class of proscribable speech often does not pose this threat." (*Id*. at pp. 387–388.)

The court next described some categories of content discrimination within a proscribable class of speech that generally do not threaten to drive viewpoints from the public sphere. The first of those categories is "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." (*R. A. V.*, *supra*, 505 U.S. at p. 388.) Providing illustrations of regulations that might fall within this category, the court explained that "[a] State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience* — *i.e.*, that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages. [Citation.] And the Federal Government can criminalize only those threats of violence that are directed against the President [citation] — since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility

that the threatened violence will occur) have special force when applied to the person of the President." (*Ibid.*)

Second, citing *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 48 (*Renton*), the court explained that content-based regulations within a proscribable category of speech are generally "valid" (*R. A. V., supra*, 505 U.S. at p. 390) when the regulation is "aimed only at the 'secondary effects' of the speech" (*id.* at p. 394). The court noted, for example, that a state could "permit all obscene live performances except those involving minors." (*Id.* at p. 389.)

Finally, the court recognized a "more general exception for content discrimination that does not threaten censorship of ideas." (*R. A. V., supra*, 505 U.S. at p. 393.) As explained by the court, "Where totally proscribable speech is at issue," there need not be any specific " 'neutral' basis [to justify the regulation] so long as the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot. (We cannot think of any First Amendment interest that would stand in the way of a State's prohibiting only those obscene motion pictures with blue-eyed actresses)." (*Id.* at p. 390.)

Having laid out the general principles applicable to content-based regulations within a proscribable category of speech, the court concluded that the statute under review was impermissible because it created a special prohibition on hate speech that insults or provokes violence " 'on the basis of race, color, [or] creed,' " while permitting symbols that are intended to express hostility for other reasons, such as "political affiliation, union membership, or homosexuality." (*R. A. V., supra*, 505 U.S. at p. 391.) The court further concluded that the

prohibition went "even beyond mere content discrimination, to actual viewpoint discrimination. Displays containing some words — odious racial epithets, for example — would be prohibited to proponents of all views. But 'fighting words' that do not themselves invoke race, color, creed, religion, or gender . . . would . . . be usable *ad libitum*." (*Ibid.*)

The court next addressed why the statute did not fall within any of the three categories of generally permissible content-based regulations it had described earlier in the opinion. Turning to the first category — "content discrimination based on the very reasons why the particular class of speech at issue . . . is proscribable" (*R. A. V.*, *supra*, 505 U.S. at p. 393) — the court explained that fighting words are excluded from First Amendment protection because their "content embodies a particularly intolerable . . . mode of expressing whatever idea the speaker wishes to convey" (*ibid.*, italics omitted). The court reasoned, however, that the ordinance at issue had "not singled out an especially offensive mode of expression. . . . Rather, it has proscribed fighting words of whatever manner that communicate messages of racial, gender, or religious intolerance." (*Id.* at pp. 393–394.)

The court also concluded the ordinance did not fall within the exception for content discrimination "aimed only at the 'secondary effects' of the speech." (*R. A. V.*, *supra*, 505 U.S. at p. 394.) St. Paul had argued this exception was applicable because the intent of the ordinance was not to limit the speech rights of the accused, but rather to protect " 'particularly vulnerable' " groups that had ' 'historically . . . been discriminated against.' " (*Ibid.*) The court disagreed, explaining that " '[t]he emotive impact of speech on its audience is not a

"secondary effect." ' " (*Ibid.*) The court likewise concluded that the "general exception" (*id.* at p. 393) for restrictions that are "beyond the suspicion of official suppression of ideas" (*id.* at p. 395) was clearly inapplicable because St. Paul had expressly argued that the intent of the statute *was* to suppress ideas expressed against specific classes of persons.

Having found that the ordinance was an impermissible content-based regulation on hate speech because its application turned on the viewpoint of the speaker, the court went on to apply strict scrutiny and found the statute unconstitutional.

### 2. People v. Stanistreet

In *Stanistreet, supra,* 29 Cal.4th 497, the defendants challenged their convictions under section 148.6(a)(1), contending that the statute violated *R. A. V.*'s rule against content-based regulations within proscribable categories of speech. The defendants argued that while California was permitted to ban all defamatory statements made against public officials (or at least those that meet the heightened mens rea requirement of *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 (*New York Times*)), the state was not permitted to "apply one defamation rule to citizen complaints against peace officers, and a different rule to those made against other public officials." (*Stanistreet*, at p. 507.)

We agreed with the defendants that section 148.6(a)'s distinct treatment of complaints against peace officers versus complaints against other public officials qualified as a content-based regulation within a proscribable category of speech, which we described as "knowingly false statements of fact." (*Stanistreet, supra,* 29 Cal.4th at p. 508.) We further held,

18

however, that the statute fell within each of the three categories of content-based regulations of proscribable speech that *R. A. V.* identified as generally not posing any threat to the marketplace of ideas.

Applying the first category — " '[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable' " (*Stanistreet, supra,* 29 Cal.4th at p. 508) — we reiterated that the relevant "[proscribable] class of speech at issue" was "knowingly false statements of fact." (*Ibid.*) Relying on *R. A. V.*'s example that " 'the reasons why threats of violence are [proscribable] . . . have special force when applied to the President' " (*ibid.*), we concluded that the reason false statements are generally proscribable likewise "has 'special force' [citation] when applied to false accusations against peace officers. When a person makes a complaint against a peace officer of the type that section 148.6 governs, the agency receiving the complaint is legally obligated to investigate it and to retain the complaint and resulting reports or findings for at least five years. (§ 832.5.) Thus, the potential harm of a knowingly false statement is greater here than in other situations." (*Ibid.*, italics omitted.)

We also found section 148.6(a) valid under *R. A. V.*'s second category of generally permissible forms of regulations, reasoning that false accusations against peace officers have "substantial secondary effects — they trigger mandatory investigation and record retention requirements" that compel law enforcement agencies to expend "[p]ublic resources . . . that could otherwise be used for other matters." (*Stanistreet, supra,* 29 Cal.4th at p. 509.) We further noted that once triggered, those mandatory requirements could "adversely affect the

accused peace officer's career, at least until the investigation is complete." (*Ibid.*)

Finally, we held that the statute was valid under *R. A. V.*'s general "catchall exception," concluding there was "no realistic possibility" (*Stanistreet*, *supra*, 29 Cal.4th at p. 509) that section 148.6(a)'s criminalization of knowingly false complaints against police was meant to suppress any particular idea or viewpoint. Rejecting the Court of Appeal's conclusion that the law might operate " 'to suppress . . . citizen complaints of police misconduct,' " we explained that "[t]he Legislature is not suppressing all complaints of police misconduct, only knowingly false ones." (*Stanistreet*, at p. 509.) We further noted that rather than disfavoring police complaints, the Legislature had in many respects "*favored*" such speech by *requiring* their investigation. (*Id.* at p. 510.) We explained that "[t]he Legislature may elevate the status of a category of complaints" by mandating that they be investigated and that the records of the investigation be retained, "and at the same time penalize those" who choose to file a knowingly false complaint after having received an admonition explaining that their allegations would trigger an investigation under California law. (*Ibid.*) "No one has a constitutional right to make a complaint of misconduct knowing both that the complaint must be investigated and that it is false." (*Ibid.*)

In a concurring opinion, Justice Werdegar (joined by Justice Moreno) agreed that section 148.6(a) was constitutional under *R. A. V.*'s secondary effects category of regulation but disagreed that either of the other two categories applied. As to the first *R.AV.* category, the concurrence defined the relevant "class of speech at issue" as "defamation," which is generally

subject to regulation because defamatory statements "may injure personal reputations without making any positive contribution to the democratic process." (*Stanistreet*, *supra*, 29 Cal.4th at p. 513, conc. opn. of Werdegar, J.) The concurrence reasoned that "section 148.6 does not target speech that is *especially* worthless or *especially* injurious to reputation. . . . [N]othing about false speech affecting peace officers . . . distinguishes it from false speech affecting other governmental officials *with respect to the grounds on which defamation is proscribable in the first place.*" (*Ibid.*)

The concurrence also rejected the majority's application of the "catchall" exception, explaining that the Legislature had created a special crime that applies only to allegations against peace officers while simultaneously creating a "unique . . . mandate" that "prospective complainants" be warned of the "possibility of criminal sanctions." (*Stanistreet*, *supra*, 29 Cal.4th at p. 513, conc. opn. of Werdegar, J.) Justice Werdegar explained that, "[r]ealistically," these features of the law would cause "some complainants . . . to choose *not* to go forward — even when they have legitimate complaints." (*Id.* at p. 514.)

### 3. *Cases decided after* Stanistreet

Since *Stanistreet* was decided, several federal decisions have weighed in either specifically on the constitutionality of section 148.6(a) or more generally on issues that relate to the analysis in *R. A. V.* and *Stanistreet*.

### a. *Federal cases finding section 148.6(a)*
###    *unconstitutional*

In *Hamilton II, supra*, 325 F.Supp.2d 1087, a plaintiff brought a federal civil rights action against the City of San Bernardino arising out of his interactions with law enforcement. (See *Hamilton I, supra*, 107 F.Supp.2d at pp. 1240–1241.) The plaintiff, a Black man, alleged that he had been unlawfully stopped on his bicycle and was then handcuffed and beaten. He was taken into custody and later released with a citation for not having a bicycle license. The plaintiff later returned to the police to lodge a citizen's complaint. According to the complaint, the watch commander questioned his story and orally advised the plaintiff that he could be prosecuted for knowingly filing a false complaint and provided a copy of the written admonition required under section 148.6(a)(2). After receiving those warnings, the plaintiff chose not to file a complaint. The plaintiff subsequently filed a civil rights complaint against the police department that included a claim alleging section 148.6(a) was unconstitutional.

The district court granted the plaintiff summary judgment on his challenge to section 148.6(a), concluding that *Stanistreet* had erred in finding that the statute fell within the categories of generally permissible content-based regulations of proscribable speech described in *R. A. V.* Regarding the first category, the court rejected *Stanistreet*'s rationale that "the reasons for proscribing defamation have special force when applied to law enforcement officers" because false complaints trigger investigation requirements that might result in "greater harm to law enforcement officers than to other groups of persons." (*Hamilton II, supra*, 325 F.Supp.2d at p. 1091.) Echoing Justice

Werdegar's concurrence in *Stanistreet*, the court found that the state had failed to show there was anything " 'about the position of a peace officer [that] is inherently tied to the policies underlying the law of defamation, as compared to the position of other government officers.' " (*Hamilton I, supra,* 107 F.Supp.2d at p. 1246.)  The court explained that, in fact, "[p]ublic officials are generally entitled to *less* protection from defamatory statements since they hold positions of prominence." (*Hamilton II*, at p. 1092, italics added.)

Regarding the "secondary effects" exception, the court concluded that "even if [California] was partly motivated by the desire to curb the harmful effects of wasted investigative resources and damage to officers' reputation, . . . these motives focus on the direct impact of the speech, not its 'secondary' effects." (*Hamilton II, supra,* 325 F.Supp.2d at p. 1093.) Because section 148.6(a) "is justified only by reference to the content of the speech . . ., the 'secondary effects' doctrine" does not apply. (*Id.* at p. 1093.)

Finally, the court rejected *Stanistreet's* conclusion that " 'the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot.' " (*Hamilton II, supra,* 325 F.Supp.2d at p. 1090.) According to the court, section 148.6(a)'s criminal provision, combined with its "mandat[e] that an individual wishing to register a complaint . . . first receive the sobering forewarning that she or he can be criminally prosecuted for making a knowingly false complaint against an officer" (*id.* at p. 1094), were "high[ly] like[ly] [to] . . . cause  individuals to refrain from filing a complaint against law enforcement officers" (*ibid.*).

Shortly after *Hamilton II* was decided, the Ninth Circuit held that section 148.6(a)(1)'s criminal provision violated the First Amendment. (See *Chaker, supra*, 428 F.3d 1215.) Unlike *Stanistreet*, the court did not focus on the fact that section 148.6(a) treats misconduct claims made against peace officers differently than complaints made against other types of public officials. Instead, *Chaker* concluded that the statute "discriminates on the basis of a speaker's viewpoint" (*Chaker*, at p. 1217) by "holding . . . citizen *complainants* accountable for their knowing falsehoods, while leaving unregulated the knowingly false speech of a peace officer or witness." (*Id.* at p. 1226.) The court observed that the state's "asserted interest" (*ibid.*) in passing section 148.6(a) — to save valuable public resources and maintain integrity in the complaint process — was undermined by "its choice to prohibit only the knowingly false speech of those citizens who complain of peace officer conduct." (*Chaker*, at p. 1226.)

### b. First Amendment decisions implicating issues related to R. A. V. and Stanistreet

In *Davenport, supra*, 551 U.S. 177, a union filed a free speech challenge to a state law that placed certain restrictions on public employee unions' ability to spend fees that they collect from employees who are not union members but who are represented by the union in collective bargaining. The law at issue required the unions to obtain affirmative consent from nonunion members before using their funds for election-related expenditures but permitted the union to expend nonmember fees for other purposes without obtaining such consent. The union argued that by placing restrictions on expenditures related to elections but not for other purposes, the statute

effectively imposed a content-based regulation that must be evaluated under strict scrutiny.

The court agreed that the statute constituted a content-based regulation and that such regulations are generally treated as "presumptively invalid." (*Davenport*, *supra*, 551 U.S. at p. 188.) Quoting *R. A. V.*, the court explained that " '[t]he rationale of the general prohibition' " on content-based discrimination is that such regulations " ' "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." ' " (*Id.* at p. 188.) The court further explained, however, that its prior cases had "identified numerous situations in which that risk is inconsequential . . . so that . . . strict scrutiny is unwarranted." (*Ibid.*) As an example, the court again cited *R. A. V.*, explaining that "content discrimination among various instances of a class of proscribable speech does not pose a threat to the marketplace of ideas when the selected subclass is chosen for the very reason that the entire class can be proscribed." (*Ibid.*) The court then applied those general principles to the statute before it, concluding that placing a "reasonable" and "viewpoint-neutral limitation" on the manner in which nonunion members' fees could be expended did not "impermissibly distort[] the marketplace of ideas." (*Id.* at p. 189.) Notably, in discussing *R. A. V.* and other First Amendment decisions addressing situations where content-based regulations are generally permissible, the court focused on the minimal risk that those forms of regulations posed to suppressing certain ideas or viewpoints, not on whether the government was in fact attempting to suppress such speech.

In *Alvarez*, *supra*, 567 U.S. 709, the Supreme Court considered a First Amendment challenge to "The Stolen Valor Act of 2005" (the Stolen Valor Act or the Act), a federal law that made it a crime to falsely represent having been awarded the Congressional Medal of Honor. Although six justices found the law to violate the First Amendment, no opinion secured a majority.

The four-vote plurality opinion began its analysis by rejecting the government's contention that false statements of fact constitute a general category of speech that lack First Amendment protection. (See *Alvarez*, *supra*, 567 U.S. at p. 722, plur. opn. of Kennedy, J. ["The Government has not demonstrated that false statements generally should constitute a new category of unprotected speech"].) While acknowledging that prior opinions contained language that could be read to support that conclusion, the plurality clarified that those cases involved false statements that were associated with a "legally cognizable harm" such as defamation or fraud. (*Id.* at p. 719.) In contrast, the plurality reasoned, the Act extended criminal liability to false claims regarding military medals, no matter the context in which they were made and regardless of whether they had caused harm. (*Id.* at pp. 722–723.) Although the plurality concluded that the Act furthered a legitimate state interest — "protecting the integrity of the military honors system" (*id.* at p. 725) — it explained that approving a criminal statute that targeted "falsity and nothing more" (*id.* at p. 719) would risk "cast[ing] a chill . . . [on speech that] the First Amendment cannot permit" (*id.* at p. 723). According to the plurality, because the Act "conflict[ed] with free speech principles" it was subject to strict scrutiny and could not satisfy that "exacting"

level of review because there were less speech-deterring ways to address the state's interests.  (*Id.* at p. 724.)

In a concurring opinion, Justice Breyer (joined by Justice Kagan) likewise rejected the government's theory that "false factual statements" are entitled to " 'no [constitutional] protection at all.' " (*Alvarez*, *supra*, 567 U.S. at p. 732, conc. opn. of Breyer, J., at pp. 732, 733.)  Unlike the plurality, however, the concurrence concluded that when evaluating a regulation of "false statements about easily verifiable facts" (*id.* at p. 732), courts should apply intermediate scrutiny, asking whether "the statute works speech-related harm that is out of proportion to its justifications" (*id.* at p. 730).  In applying that test, the concurrence noted that the Act lacked any of the "limiting features" (*id.* at p. 736) that were evident in numerous other prohibitions on falsity the court had previously endorsed.  Those limitations included, for example, "requiring proof of specific harm to identifiable victims" or limiting the reach of the statute to statements made in "contexts in which a tangible harm to others is especially likely to occur."  (*Id.* at p. 734.)  In contrast, the Act's broad prohibition on any knowing false claims about being a medal recipient "create[d] a significant risk of First Amendment harm" by (among other things) broadly applying to contexts in which the falsity would be unlikely to cause harm, inviting selective prosecutions on the part of the government and "chilling . . . [speakers who] might still be worried about being prosecuted for a careless false statement."  (*Id.* at p. 736, italics omitted.)  The concurrence ultimately concluded that while the Act had laudable objectives, it could not pass intermediate scrutiny because the government had failed to

show "why a more finely tailored statute would not" satisfy those goals. (*Id*. at p. 739.)

Finally, in *Free Speech Coalition*, *supra*, 606 U.S. 409, the court addressed the constitutionality of a state law requiring "commercial websites that publish sexually explicit content to verify the ages of their visitors." (*Id*. at p. 462.) The state argued that the law was only subject to "rational-basis review" (*id*. at p. 477) because it regulated an unprotected form of speech, namely "speech that is obscene to minors" (*id*. at p. 482). While the court agreed that the statute did not "directly regulate . . . protected speech" (*ibid*.), it concluded that heightened scrutiny was nonetheless warranted because the age verification statute had an "incidental burden" on protected speech, namely "adult[s'] . . . right to access speech that is *obscene only to minors*" (*id*. at p. 495, italics added).

The court went on to hold that intermediate scrutiny was the appropriate standard of review for laws that "directly regulate[] unprotected activity . . . while only incidentally burdening protected activity." (*Free Speech Coalition*, *supra*, 606 U.S at p. 492.) The more "unforgiving" strict scrutiny standard, the court explained, is reserved for restrictions that "direct[ly] target[] . . . fully protected speech." (*Id*. at p. 484.) According to the court, while not as exacting as strict scrutiny, intermediate scrutiny nonetheless "plays an important role in ensuring" that statutes with an "ostensibly legitimate purpose[]" are not structured in a manner that threatens to "suppress fundamental rights." (*Id*. at p. 495.) The court explained for example, that while merely requiring an adult to verify their age through a routine credit-card transaction was

permissible, the state could not "require as proof of age an 'affidavit' from the individual's 'biological parent.' " (*Ibid.*)

## B. Is There an Adequate Basis to Reconsider *Stanistreet*?

Before addressing the merits of the parties' arguments regarding section 148.6(a), we first address whether there are appropriate grounds to reconsider our holding in *Stanistreet, supra*, 29 Cal.4th 497, given the doctrine of stare decisis.[8] (See *Moradi-Shalal, supra*, 46 Cal.3d at p. 296 [stare decisis requires that "prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices"].) For the reasons explained below, we conclude that a re-examination is warranted.

While we do not "lightly" depart from past precedents, stare decisis nonetheless remains a " 'a flexible [policy].' " (*People v. Mendoza* (2000) 23 Cal.4th 896, 924.) "[R]eexamination of precedent may become necessary when subsequent developments indicate an earlier decision was unsound, or has become ripe for reconsideration." (*In re Jaime P.* (2006) 40 Cal.4th 128, 133.) " 'This is especially so when [the issues under consideration] . . . relate[] to "matter[s] of continuing concern" to the community at large.' " (*Moradi-Shalal, supra*, 46 Cal.4th at p. 296.)

---

[8] Although the LAPPL has not raised any arguments directly predicated on the stare decisis effect of *Stanistreet*, we nonetheless think it appropriate to address this "fundamental jurisprudential policy." (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296 (*Moradi-Shalal*).)

Those factors are clearly implicated here. We are presented with a constitutional question regarding the validity of a statute that implicates a subject — " '[c]riticism of public officials[ — that] lies at the very core of speech protected by the First Amendment.' " (*Green v. City of St. Louis* (8th Cir. 2022) 52 F.4th 734, 739 (*Green*); accord *Hernandez v. City of Phoenix* (9th Cir. 2022) 43 F.4th 966, 981.) What restrictions, and in particular what *criminal* restrictions, our government may place on speech related to the misconduct of police officers is clearly a matter of continuing concern to the public at large.

Moreover, in the years since *Stanistreet* was decided, multiple federal decisions have rejected its reasoning, creating a split of authority that has resulted in a mandatory injunction issued by a state superior court (and affirmed by the Court of Appeal) directing that the City enforce section 148.6(a)(2)'s admonishment requirement despite the fact that the Ninth Circuit has held that the criminal provision that section 148.6(a)(2) references is unconstitutional. (See *Swift & Co. v. Wickham* (1965) 382 U.S. 111, 116 [reevaluation of precedent may be necessary where prior holding has created practical complications or resulted in "mischievous consequences to litigants and courts"].)[9]

---

[9] The potential problems that split has caused are not just theoretical. In *Cuadra v. City of South San Francisco* (N.D.Cal., Jan. 4, 2010, No. C 08-3439 TEH) 2010 WL 55875 (*Cuadra*), the plaintiff brought a federal civil rights action against the City of South San Francisco after being arrested for violating section 148.6(a)(1). The officers who prepared the police report that led to the plaintiff's arrest moved for summary judgment on the

Most critically, as discussed in more detail below, since *Stanistreet* was decided, the United States Supreme Court has issued multiple rulings that provide further guidance regarding how we should evaluate the constitutionality of a statute like section 148.6(a), which discriminates based on content within a proscribable class of knowing falsehoods (defamation). (See *Davenport, supra,* 551 U.S. at p. 188 [describing when restrictions on speech that fall outside " 'the general prohibition' " on content-based regulations warrant heightened scrutiny]; *Alvarez, supra,* 567 U.S. at p. 709 [false statements do not qualify as a category of unprotected speech]; *Free Speech Coalition, supra,* 606 U.S. at p. 495 [content-based restrictions that regulate unprotected speech are subject to heightened review if they incidentally burden protected speech].)

For all those reasons, we believe this is an appropriate case in which to revisit our prior precedent in *Stanistreet*.

## C. Is Section 148.6(a)(1) a Valid Restraint on Speech?

### 1. *Section 148.6(a) qualifies as a content-based regulation within a proscribable category of speech*

The question we must address in this case is whether section 148.6(a) constitutes an impermissible content-based restriction on speech. The parties do not dispute that the statute, which makes it a crime to file a knowingly false "allegation" of police misconduct and compels complainants to

---

basis of qualified immunity. The federal court denied the motion, explaining that there "was no probable cause to arrest [plaintiff] for breaking a law that had already been held unconstitutional [by the Ninth Circuit], which means a constitutional right was violated." (*Id.* at pp. *28–29.)

read and sign an admonition acknowledging it is a crime to file a knowingly false "complaint against an officer," qualifies as a content-based regulation of speech. (§ 148.6(a), capitalization and boldface omitted; see generally *Reed v. Town of Gilbert* (2015) 576 U.S. 155, 163 (*Reed*) [a law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed"]; *McCullen v. Coakley* (2014) 573 U.S. 464, 479 [law is content based if it "require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation [of the law] has occurred"].)

Content-based laws are presumptively unconstitutional and generally subject to strict scrutiny. (*Reed, supra,* 576 U.S. at p. 163.) Notwithstanding that general rule, our high court has identified limited situations in which strict scrutiny does not automatically apply. It is well-established, for example, that content-based restrictions are permissible on speech that falls within certain " ' "historic and traditional categories [of expression] long familiar to the bar," ' " including (among other categories) defamation, fraud, fighting words and obscenity. (*Alvarez, supra,* 567 U.S. at p. 717, plur. opn of Kennedy, J.; see *R. A. V., supra,* 505 U.S. at p. 388.) *R. A. V.,* in turn, established an alternate framework of analysis for "content discrimination among various instances of a class of proscribable speech." (*R. A. V.,* at p. 388; see *Chaker, supra,* 428 F.3d at p. 1224 ["The leading case establishing the First Amendment's application to proscribable classes of speech is *R. A. V.*"].)

Accordingly, the first issue we must address is whether section 148.6(a) qualifies as a content-based restriction within a proscribable category of speech, thus triggering review under

the principles of *R. A. V.*, or whether it implicates "fully protected speech" (*R. A. V.*, *supra*, 505 U.S. at p. 387), thus automatically triggering strict scrutiny review. As explained above, *Stanistreet* concluded that review under *R. A. V.* was appropriate because "[s]ection 148.6 proscribes only constitutionally unprotected speech — *knowingly false statements of fact*." (*Stanistreet*, *supra*, 29 Cal.4th at p. 501, italics added; see *id*. at p. 508 ["the entire class of speech at issue — knowingly false statements of fact — is proscribable"].) *Alvarez*, *supra*, 567 U.S. 709, however, has since suggested that we were incorrect in concluding that knowingly false statements of fact qualify as a category of proscribable speech. (See *ante*, at pp. 26–28.)

While true that without the benefit of *Alvarez*, *Stanistreet* broadly characterized the relevant category of proscribable speech as "knowingly false statements of fact" (*Stanistreet*, *supra*, 29 Cal.4th at p. 508), our analysis in that case nonetheless makes clear that we also viewed section 148.6(a) as regulating a subclass of false statements that unquestionably falls outside the protections of the First Amendment, namely defamatory falsehoods. Our decision, for example, characterized the defendants' core constitutional argument to be that section 148.6(a) impermissibly establishes different "defamation rule[s]" for complaints against peace officers. (*Stanistreet*, at p. 507.) Further, when summarizing the applicable First Amendment principles at issue, we focused almost exclusively on Supreme Court precedent addressing the limitations on *defamation* actions against public officials. (See *id*. at pp. 505–506 [discussing *New York Times*, *supra,* 376 U.S. 254 and *Garrison v. Louisiana* (1964) 379 U.S. 64].) And when

addressing why we need not consider "the California Constitution as a separate basis to invalidate section 148.6," we explained that "California law regarding defamation is coterminous with that of the United States Constitution." (*Stanistreet*, at p. 504, fn. 3; see *id.* at p. 507, fn. 4 [noting that *R. A. V.* "cited defamation as an example of the kind of proscribable speech it was talking about"].)

We now confirm what we implied in *Stanistreet*: section 148.6(a) criminalizes allegations of police misconduct that are defamatory in nature. Indeed, the legislative history makes clear that one of the primary motivations in enacting section 148.6(a) was to protect law enforcement from the professional and reputational harms that result from knowingly false allegations of misconduct. (See *ante*, at pp. 10–12; *Stanistreet*, *supra*, 29 Cal.4th at p. 503 [§ 148.6(a) was intended to address "frivolous complaints *which can affect the individual officer's future*" and have an " 'adverse impact' " on peace officers' careers], italics added; see also Rest.2d Torts, § 569, com. e [statements that "attribute . . . conduct or characteristics incompatible with the proper conduct . . . or with the proper discharge of . . . duties as a public officer" are generally deemed to be defamatory].) Accordingly, we conclude that section 148.6(a) constitutes a content-based regulation within a proscribable category of speech and is therefore subject to review under the framework set forth in *R. A. V.*

    2.   *Application of R. A. V.*

        a.   *General principles guiding the evaluation of content-based regulations of defamation*

*R. A. V.* makes clear that some forms of content-based regulation within a proscribable class of speech warrant

heightened scrutiny while others do not. (See *R. A. V.*, *supra*, 505 U.S. at p. 384.) The high court's decision, however, leaves some uncertainty as to how, exactly, courts should evaluate whether a particular form of content-based regulation within a proscribable class of speech warrants additional scrutiny. Broadly speaking, the court explained that while content-based regulations are generally prohibited because they " 'raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace' " (*id.* at p. 388), many forms of "content discrimination among various instances of a class of proscribable speech . . . do[] not pose this threat" (*id.* at p. 388). The court then described three categories of content discrimination within a proscribable category of speech that generally "do not threaten to drive ideas or viewpoints from the marketplace and hence are permissible." (*Stanistreet*, 29 Cal.4th at p. 508, citing *R. A. V.*, at pp. 388–390.)

While these three categories play an important role in assessing whether a content-based regulation within a proscribable category of speech warrants further scrutiny, we believe they are best understood as proxies for the ultimate question that courts must decide when evaluating such a regulation: Does the form of regulation that the Legislature adopted create a consequential risk of " 'driv[ing] certain ideas or viewpoints' " from the public sphere? (*R. A. V.*, *supra*, 505 U.S. at p. 387; see *Davenport*, *supra*, 551 U.S. at p. 188 [characterizing the first *R. A. V.* "category" of permissible regulation — "when the selected subclass is chosen for the very reason that the entire class can be proscribed" — as one situation where "the risk" that the regulation "will

impermissibly interfere with the marketplace of ideas" is so "inconsequential" that further scrutiny "is unwarranted"].)

*Alvarez, supra*, 567 U.S 709, applied similar principles in the context of regulations that prohibit knowing falsehoods. A majority of the court there concluded that some forms of prohibitions on knowingly false statements, even well-intentioned ones, can trigger constitutional scrutiny if the prohibition is written in such a manner that it unduly burdens protected speech. (See *id.* at p. 723, plur. opn. of Kennedy, J. [permitting the government to criminalize any knowingly false statement regarding the receipt of a military medal, regardless of context, would "cast[] a chill . . . the First Amendment cannot permit"]; *id.* at p. 736, conc. opn. of Breyer, J. [while limiting the Act to "knowing and intentional acts of deception . . . reduc[es] the risk that valuable speech is chilled," the "breadth" of the statute nonetheless "creates a significant risk of First Amendment harm"; "a speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable"], italics omitted.) Thus, much like content-based regulations within a proscribable category of speech, a core concern with statutes targeting knowing falsehoods is whether they risk driving out certain forms of ideas from the marketplace, which includes "true" (or at least well-intentioned) speech. (*Id.* at pp. 733, 736, conc. opn. of Breyer, J. [prohibitions on falsity "can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart"; "a speaker might . . . be worried about being prosecuted for a careless false

statement, even if he does not have the intent required to render him liable"], italics omitted.)[10]

Most recently, the Supreme Court's decision in *Free Speech Coalition*, *supra*, 606 U.S. 461, confirmed what was implied in *R. A. V.* and *Davenport*: Statutes that regulate only unprotected categories of speech can be subject to heightened scrutiny if they have " 'an incidental effect on protected speech.' " (*Free Speech Coalition*, at p. 478, quoting *Boy Scouts of America v. Dale* (2000) 530 U.S. 640, 659.) Thus, the mere fact that we have construed section 148.(6)(a) as applying to an unprotected category of speech — knowingly false, defamatory claims of police misconduct — does not foreclose the possibility that the statute's impacts on protected speech (truthful or well-intentioned claims of police misconduct) might warrant heightened review.

While there remains some uncertainty regarding the specific contours of the high court holdings discussed above, the fundamental principle we derive from those cases is that when assessing a content-based regulation within a proscribable class of speech, courts must evaluate whether the "risk" (*Davenport*, *supra*, 551 U.S. at p. 188) that the prohibition will " 'drive certain ideas or viewpoints' " (*R. A. V.*, *supra*, 505 U.S. at p. 387)

---

[10] In *Alvarez*, 567 U.S 709, the court expressed concerns about multiple effects of the Stolen Valor Act, which broadly criminalized knowingly false claims of having received certain types of military medals. Those concerns included prohibiting lies in contexts where they were unlikely to cause harm (e.g., private conversations in the bedroom) and chilling nonmalicious forms of speech, including true speech. (See *id.*, plur. opn. of Kennedy J., at pp. 722–723; conc. opn. of Breyer, J., at pp. 733–734, 736.)

from the public sphere is so "inconsequential" (*Davenport*, at p. 188) that further constitutional scrutiny is unwarranted. (See *R. A. V.*, *supra*, 505 U.S. at p. 387.)  Stated differently, courts should ask whether the regulation disfavors certain viewpoints (as in *R. A. V.*) or is structured in a manner that burdens protected forms of speech, whether directly (as in *Alvarez*) or incidentally (as in *Free Speech Coalition*).  *Alvarez* suggests that when a statute targets a form of knowing falsehood (as section 148.6(a) does), the court's evaluation should take into account whether the prohibition is drafted in such a manner that it creates a consequential risk of chilling citizens from engaging in protected forms of speech, including truthful speech.  Consideration should also be given to the various categories of content discrimination described in *R. A. V.* that generally "do[] not threaten censorship of ideas." (*R. A. V.* at p. 393; see *id.* at p. 388.)

Finally — and critically — while *R. A. V.* includes language suggesting as much, cases like *Davenport*, *Alvarez*, and *Free Speech Coalition* make clear that in conducting this inquiry, the ultimate question is not whether there is reason to believe that the government actually *intended* to drive out certain viewpoints or forms of protected speech, but rather whether the means that government has selected — even if well-intentioned — create a substantial risk of doing so.  (See *R. A. V.*, *supra*, 505 U.S. at pp. 387, 388 [some forms of content-based regulations within proscribable classes of speech do not "pose [the] . . . threat" of " '*effectively* driv[ing] certain ideas or viewpoints from the marketplace' "], italics added; *Davenport*, *supra*, 551 U.S. at pp. 188, 189 [describing relevant inquiry as

whether regulation "pose[s] a threat to the marketplace of ideas" or "impermissibly distort[s] the marketplace of ideas"].)

> b. *Section 148.6(a) raises substantial risks to the marketplace of ideas*

Applying the *R. A. V.* framework, as supplemented by the high court's analysis in *Davenport, Alvarez,* and *Free Speech Coalition,* we conclude that section 148.6(a)'s criminal provision (subdivision (a)(1)) and its accompanying admonition requirement (subdivision (a)(2)) exhibit numerous characteristics that, considered together, "incidental[ly] burden" (*Free Speech Coalition, supra,* 606 U.S. at p. 483) or otherwise present a reasonable risk of driving certain forms of protected speech — namely, truthful (or at least not knowingly false) complaints of police misconduct — from the public sphere so as to warrant additional scrutiny.

First, section 148.6(a) does not merely regulate speech, but imposes *criminal liability* on speech. As our high court has repeatedly explained, "[T]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images. [Citation.] As a practical matter, this increased deterrent effect . . . poses greater First Amendment concerns than those implicated by . . . civil regulation." (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 872 (*Reno*); see *City of Houston v. Hill* (1987) 482 U.S. 451, 459 ["Criminal statutes [involving speech] must be scrutinized with particular care"]; *U.S. v. Caronia* (2d Cir. 2012) 703 F.3d 149, 163 ["Criminal regulatory schemes [on speech] . . . warrant even more careful scrutiny"]; *Ashcroft v. American Civil Liberties Union* (2004) 542 U.S. 656, 660 ["Content-based prohibitions, enforced by severe criminal

penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people"].)

Second, section 148.6(a) singles out for criminal treatment speech that is critical of a particular class of government official — law enforcement — whose "duties . . . tend naturally to have a relatively large or dramatic impact on members of the public." (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1611 (*Kahn*).) Courts have long emphasized that "the freedom to criticize public officials and expose their wrongdoing is a fundamental First Amendment value." (*Arnett v. Myers* (6th Cir. 2002) 281 F.3d 552, 560; see *Rosenblatt v. Baer* (1966) 383 U.S. 75, 85 ["Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized"].) Thus, section 148.6(a) is rare not only in that it imposes a form of penalty that has been recognized to have a particularly deterrent effect on speech — criminal liability — but also implicates a topic — criticism of law enforcement — that " 'lies at the very core of . . . the First Amendment.' " (*Green, supra,* 52 F.4th at p. 739.)

Adding to those concerns, section 148.6(a)(1)'s criminal provision is asymmetrical in its application, criminalizing knowingly false complaints filed against law enforcement personnel — and expressly requiring complainants be told of that possibility — while leaving unregulated (and requiring no admonition against) knowingly false claims that a witness might make against the complainant during any ensuing

investigation.[11]    LAPPL argues that this asymmetry is understandable given that a knowingly false allegation of misconduct triggers a mandatory investigation but a knowingly false statement supportive of law enforcement has no such effect.    That does not change the fact, however, that complainants face a situation in which they can be prosecuted if authorities believe they are lying about their allegations of misconduct — and are forcefully reminded of that possibility through the admonition requirement (discussed more below) — but witnesses speaking in favor of the accused officers would face no such consequence under this law were they to lie about the events in question.  The concern with the statute then is not its " 'underinclusiveness' " per se (*R. A. V.*, *supra*, 505 U.S. at p. 387) — i.e., extending speech-related protections to one

---

[11]    Multiple federal courts have held that section 148.6(a)'s disparate treatment of false claims made against police versus false claims made in support of police in the context of an official investigation qualifies as a form of "viewpoint" discrimination, a subset of content-based restrictions that can "rarely, if ever, . . . withstand [constitutional] . . . scrutiny."    (*Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commissioner of Virginia Dept. of Motor Vehicles* (4th Cir. 2002) 288 F.3d 610, 616, fn. 4; see *Chaker*, *supra*, 428 F.3d at p. 1227 [§ 148.6(a) "regulates an unprotected category of speech, but singles out certain speech . . . based on the speaker's viewpoint"]; *Hamilton II*, *supra*, 325 F.Supp.2d at p. 1094 [§ 148.6(a) "discriminates based on viewpoint"].)

Because we conclude that section 148.6(a) is an invalid content-based regulation, we need not address whether it might also qualify as an invalid viewpoint-based regulation.  (See generally *Iancu v. Brunetti* (2019) 588 U.S. 388, 418, conc. & dis. opn. of Sotomayor, J. ["the line between viewpoint-based and viewpoint-neutral content discrimination can be 'slippery' "].)

category of public official that other persons do not enjoy — but rather that it does not treat defamatory expressions made in the context of the same official police misconduct proceeding the same way.[12]

More troubling still, section 148.6(a)(1)'s criminal provision is accompanied by an admonition requirement that contains various speech deterring elements. Section 148.6(a)(2) prohibits law enforcement from accepting an official claim of misconduct unless the complainant reads and signs an admonition, which must be written in bold printed capital letters, warning that "**IT IS AGAINST THE LAW TO MAKE A COMPLAINT THAT YOU KNOW TO BE FALSE. IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE**

---

[12] The dissent argues that these asymmetry concerns are unfounded because a witness testifying in support of a peace officer would still be subject to criminal liability under section 132. (See dis. opn. of Liu, J., *post*, at pp. 9–10.) That provision directs that, in any trial or official proceeding, it is a crime to submit a knowingly forged or fraudulently altered "instrument in writing." (§ 132.) The asymmetry remains, however, because section 132 would not appear to reach *oral statements* a witness for the peace officer might make during an official investigation. The dissent also relies on section 118, which is California's prohibition on perjury. But section 118 pertains only to people who have taken an oath and the dissent has provided no basis to conclude that witness statements made in the context of section 832.5 police investigations are generally required to be made under oath. Nothing in section 132 or section 118 alters the basic fact that section 148.6(a) criminalizes knowingly false allegations of misconduct that are filed against a peace officer while leaving unregulated knowingly false allegations that are made in support of an accused peace officer.

**PROSECUTED**.” (*Ibid*.) Potential complainants are thus effectively told: To lodge a complaint against a police officer, you must first sign an acknowledgment that we can charge you with a crime if we think you are being knowingly untruthful about the allegations of misconduct levied against the employees of our agency. Those concerns are compounded by the fact that, at least in some situations, it appears that the admonition will be provided *by another law enforcement agent in the setting of a police station*. And these concerns are further exacerbated by the fact that the very entity the citizen is making the complaint to will often be the same entity that decides whether the complainant has committed a crime pursuant to this statute for purposes of effectuating their arrest. (See *Cuadra, supra*, 2010 WL 55875 [supervising captain of precinct found the defendant's allegations of misconduct untruthful and prepared report referring the defendant for prosecution under section 148.6(a)].)

As Justice Werdegar astutely observed in *Stanistreet, supra*, 29 Cal.4th 497, subdivision (a)(2) “is unique in its mandate that the possibility of criminal sanctions for knowingly false complaints be prominently held up before prospective complainants at a critical juncture. In many police misconduct situations, it inevitably will come down to the word of the citizen against the word of the police officer or officers, in which case law enforcement authorities will conduct an investigation to determine who is telling the truth. If authorities for any reason disbelieve the citizen, the citizen (whether guilty or innocent) may then . . . face both criminal prosecution and the burden and expense of retaining a defense attorney. Prospective complainants cannot help but be aware of these realities when deciding whether to go forward with their complaints by signing

the statute's required admonition.  Realistically, some complainants are likely to choose not to go forward — even when they have legitimate complaints." (*Id.* at pp. 513–514, conc. opn. of Werdegar, J., italics omitted; accord *Hamilton II*, *supra*, 325 F.Supp.2d at p. 1094 ["There is a high likelihood that Section 148.6's warning will cause individuals to refrain from filing a complaint against law enforcement officers"].)  Similarly problematic, the admonition requirement may well deter reporting by persons who merely *suspect*, but cannot be certain, that they were a victim of more subtle forms of police misconduct such as racial profiling or an unlawful stop.  (See *Alvarez*, *supra*, at p. 736, conc. opn. of Breyer, J. [mens rea element does not eliminate the risk that "a speaker might . . . be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable"], italics omitted.)

In sum, subdivision (a)(2) requires that:  (1) complainants walk into a police station and locate the appropriate person to complain to, who will likely be a uniformed police officer; (2) complainants make known that they want to levy a serious complaint of misconduct against one of the colleagues of the person they are complaining to; (3) complainants will then be told that before the police will even accept a complaint, they must sign an advisory acknowledging that they can be criminally charged if law enforcement believes that anything they say is knowingly false; and (4) the entity that will make a determination of falsity for purposes of effectuating an arrest is, in the first instance, likely to be the very entity that the person is complaining about.  It is reasonable to assume that when presented with such a situation, some citizens — whether

fearful of retaliation for truthful reports of misconduct or merely uncertain whether the alleged misconduct can be proven — might well throw up their hands and ask, "Why bother?"

Raising further concerns, the language of subdivisions (a)(1) and (a)(2) introduces uncertainty and confusion as to the specific scope of statements that might fall within the criminal provision. Subdivision (a)(1) criminalizes any knowingly false "allegation of misconduct" but includes no definition of what might constitute "misconduct." (See, e.g., *Giaccio v. Pennsylvania* (1966) 382 U.S. 399, 404 [statute allowing jury to assess costs based on a finding that party engaged in "misconduct" deemed impermissibly vague]; *Perrine v. Municipal Court* (1971) 5 Cal.3d 656, 663 [statute deemed vague for failing to "define what constitutes 'acts of sexual misconduct' "]; *Soglin v. Kauffman* (7th Cir. 1969) 418 F.2d 163, 168 [the "use of 'misconduct' " as a standard in imposing student discipline "contains no clues which could assist . . . in determining whether conduct not transgressing statutes is susceptible to punishment"].) Nor does subdivision (a)(1) expressly require that the false statement be material to the allegations at issue or that the statement actually caused any harm to the accused. (See *Animal Legal Defense Fund v. Reynolds* (8th Cir. 2021) 8 F.4th 781, 787 (*Animal Legal Defense Fund*) [applying *Alvarez* in invalidating a statute prohibiting falsehoods on an employment application and noting that "the absence of a materiality requirement" distinguished the statute from "permissible prohibitions on fraud, perjury, and lying to government officials"].)

Subdivision (a)(2)'s admonition provision uses entirely different — and arguably erroneous — language to explain the

45

scope of subdivision (a)(1)'s criminal provision. It states, in relevant part: "You have the right to make a complaint against a police officer for any *improper* police conduct. . . . [¶] It is against the law to make *a complaint* that you know to be false. If you make *a complaint* against an officer knowing that it is false, you can be prosecuted on a misdemeanor charge." (§ 148.6(a)(2), italics added and boldface and all caps omitted.) The term "improper police conduct" could be reasonably construed as encompassing a broader category of behavior than "misconduct." (Compare Black's Law Dict. (9th ed. 2009) p. 826, col. 1 [defining "improper" as "incorrect; unsuitable or irregular"] with *id.* at p. 1089, col. 1 [defining "misconduct" as "a dereliction of duty"].) And whereas subdivision (a)(1) makes clear that it is a knowingly false "allegation of misconduct" that triggers the criminal sanction, the admonition in subdivision (a)(2) simply states it is a misdemeanor to file any "complaint" that one knows to be false. Given that complainants must also be asked to sign the admonition attesting they "have read and understood the above statement" (even though they might not have), a legitimate complainant might reasonably but erroneously conclude they are being asked to guarantee the accuracy of *all facts* contained in the complaint under threat of possible prosecution, and not simply those material to the allegations of misconduct. (See Racial Identity & Profiling Advisory Board (RIPA) Annual Report 2025, at pp. 170–171 <https://oag.ca.gov/system/files/media/ripa-board-report-2025.pdf> [as of Nov. 10, 2025][13] (RIPA Annual Report 2025)

---

[13] All Internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/opinions/cited-supreme-court-opinions>

[advisory's wording may cause citizens to believe that "the inclusion of a single, inaccurate allegation that is not material to the claim of misconduct is enough for prosecution"].) Given the breadth and "different linguistic form[s]" (*Reno*, *supra*, 521 U.S. at p. 871) of the language that subdivisions (a)(1) and (a)(2) employ in defining the scope of potential criminal liability, the statute raises concerns that persons of common intelligence will be left to "guess at its meaning and differ as to its application." (*Connally v. General Construction Co.* (1926) 269 U.S. 385, 391; *Reno*, at p. 871 [statute's use of "different linguistic form[s]" to describe scope of potential criminal liability "will provoke uncertainty among speakers about how the two standards relate to each other and just what they mean"], fn. omitted.)

We acknowledge that section 148.6(a) does have certain narrowing requirements. First, as noted, section 148.6(a)(1) applies only to *knowingly* false allegations of misconduct. But as our high court made clear in *Alvarez*, the presence of a mens rea requirement does not invariably shield content-based statutes regulating falsity from constitutional scrutiny. In this case, we are unpersuaded that the statute's limitation to knowing falsehoods eliminates the substantial chilling risks presented by the combined effects of the various characteristics discussed above.

Second, unlike the Stolen Valor Act at issue in *Alvarez*, section 148.6(a) does not criminalize knowingly false claims of police misconduct "made to any person, at any time, in any context." (*Alvarez*, *supra*, 567 U.S. at p. 720, plur. opn. of Kennedy, J.) Instead, section 148.6(a) applies only to persons who "file[]" a knowingly false allegation of police misconduct.

47

We have previously construed this language to limit the statute's application to official complaints of misconduct that trigger the investigation requirements set forth in section 832.5. (See *Stanistreet, supra,* 29 Cal.4th at p. 511 ["section 148.6 applies only to formally filed accusations that the agency must investigate"].) Presumably then, the statute would not apply to knowing falsehoods delivered through other channels, such as picketing, social media or the press. The fact remains, however, that the "context" (*Alvarez, supra,* 567 U.S. at p. 720, plur. opn. of Kennedy, J.) section 148.6(a) *does* target (official citizens' complaints) is a particularly important and utilitarian form of government criticism in California: complaints that the government is *required to investigate and respond to.* The fact that section 148.6(a) leaves other avenues of criticism unregulated does little to negate our concerns regarding the statute's potential speech-deterring effects on the most accessible and effective mode of reporting police misconduct that is available to the citizens of California.

In sum, we do not question whether section 148.6(a) was intended to address a legitimate problem facing law enforcement (the filing of knowingly false police complaints), or that a different law crafted more narrowly and specifically might pass constitutional muster. Nonetheless, we conclude that the combined effect of the statutory scheme creates more than an "inconsequential" risk of driving out certain ideas or viewpoints that are at the very core of the First Amendment, namely speech that reveals, and seeks redress for, official abuses of power. Much like the situation in *Free Speech Coalition, supra,* 606 U.S. 461, because section 148.6(a) targets an unprotected category of speech (knowingly false defamatory

allegations of misconduct) in a manner that incidentally burdens protected speech (well-intentioned reports of police misconduct) further constitutional scrutiny is warranted.[14]

    *c.   Stanistreet's application of R. A. V.*

    LAPPL's defense of section 148.6(a) focuses on the reasoning of *Stanistreet, supra,* 29 Cal.4th 497, which was issued without the benefit of decisions such as *Davenport,*

---

[14]    Although *Free Speech Coalition* makes clear that regulations on unprotected speech are subject to heightened scrutiny if they incidentally burden protected speech, the opinion does not examine what qualifies as an "incidental burden" or how courts should evaluate whether a regulation on unprotected speech burdens protected speech. In our view, however, the burden section 148.6(a) places on truthful (or at least not knowingly false) reports of police misconduct is at least as great (and arguably greater) than the "modest burden" (*Free Speech Coalition, supra,* 606 U.S. at p. 496) that the statute at issue in *Free Speech Coalition* places on adults' ability to access sexually explicit material. That statute required adult websites to verify users' age through various means such as a simple "credit-card transaction[]" (*ibid.*) or obtaining proof of age through "a third-party verification service" (*id.* at p. 497). According to the court, similar verification methods were already in use by "tens of thousands" of adult websites and numerous other age-restricted online services. (*Ibid.*)

    As enumerated above, the statute here includes a broadly worded criminal provision that is accompanied by an unusual admonition requirement. These statutory elements, as described by the *Hamilton II* court, create a "potent disincentive" for citizens to file even well-intentioned complaints of police misconduct. (*Hamilton II, supra,* 325 F.Supp.2d at p. 1094; see *ante,* at pp. 39–49.) We do not believe that section 148.6(a)'s potential chilling impacts can be reasonably characterized as less obtrusive than submitting proof of age to a third-party verification service.

*Alvarez* and *Free Speech Coalition* (and before multiple federal courts found section 148.6(a) violative of free speech principles). As noted, *Stanistreet* did not directly address whether the features of section 148.6(a) risk driving certain ideas or viewpoints from the public sphere by burdening protected speech. Instead, *Stanistreet*'s analysis focused on whether section 148.6(a) fell within any of the three categories of content-based regulations that *R. A. V.* had — in the words of *Stanistreet* — "identified [as] . . . not threaten[ing] to drive ideas or viewpoints from the marketplace." (*Stanistreet, supra,* 29 Cal.4th at p. 508.) *Stanistreet* ultimately concluded that section 148.6(a) fell within each of three *R. A. V.*-delineated categories and was therefore constitutionally "permissible." (*Stanistreet,* at p. 508.) Our analysis gave little consideration as to whether or how the principles of *R. A. V.* might apply to content-based regulations within proscribable classes of speech that have an incidental burden on protected forms of speech, including true (or well-intentioned) speech.[15] Instead, we

---

[15] To the extent *Stanisreet* addressed the potential effects that section 148.6(a) might have on protected speech, it did so only through the framework of the overbreadth doctrine, a variant of First Amendment jurisprudence law whereby "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " (*United States v. Stevens* (2010) 559 U.S. 460, 473 (*Stevens*).) *Stanistreet* reasoned that because section 148.6(a) only applies to knowingly false and officially filed claims of misconduct — a variant of speech it deemed to be categorically unprotected — the statute could not be said to be overbroad. (*Stanistreet, supra,* 29 Cal.4th at p. 511.)

effectively concluded that if a content-based regulation falls within any one of the *R. A. V.* categories, it is valid under the First Amendment.

However, with the benefit of subsequent case law, we believe that when assessing a content-based regulation within a proscribable category of speech, consideration should be given not only to whether the regulation falls within one of the categories described in *R. A. V.*, but also whether the regulation may incidentally burden protected speech. (See *Free Speech Coalition*, 606 U.S. at pp. 482–483.) In other words, the *R. A. V.* categories are best understood as examples of content discrimination that *generally* pose a lesser risk of either suppressing disfavored viewpoints or consequentially burdening protected speech. (See *ante*, at pp. 34–39.) As explained above, in this case we are concerned about section 148.6(a)'s potential effects on protected speech.

Applying the first *R. A. V.* category, for example, LAPPL argues that the reason defamation is proscribable — to protect

---

As explained above, however, the problem with section 148.6(a) is not that the statute violates the overbreadth doctrine by criminalizing some forms of protected speech. Indeed, we *agree* with *Stanistreet* that, on its face, the statute only criminalizes unprotected speech (knowing, defamatory falsehoods). (See *ante*, at pp. 32–34.) Rather, the problem is that under the framework *R. A. V.* provides for evaluating content discrimination within a proscribable class of speech, we cannot say that the risk of official suppression of ideas through section 148.6(a), including the risk of deterring citizens from filing truthful complaints of police misconduct is so "inconsequential" as to uphold the statute with no further scrutiny. (*Davenport*, *supra*, 551 U.S. at p. 188; see also *Free Speech Coalition*, *supra*, 606. U.S. at pp. 482–483, 495.)

against "injury to reputation" (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 348 ) — applies with special force in this context because section 832.5 requires that all claims of misconduct filed against law enforcement must be investigated, thereby exposing accused officers to heightened risks of reputational and professional harm. But even if we accept the premise that section 832.5's investigation requirements transform knowingly false complaints against police officers into a particularly injurious form of defamation, that does not mean that the mechanism the Legislature chose to address those problems is categorically immune from further scrutiny *regardless of its effect on protected speech. Alvarez, supra,* 567 U.S. 709, for example, illustrates that while the government is frequently justified in regulating false statements that are associated with legitimate harms (in the case of *Alvarez,* compromising the integrity of the Congressional Medal of Honor), courts will nonetheless apply heightened scrutiny when the government's chosen means of deterring such falsity unduly burdens protected speech. Similarly, as the high court explained in *Free Speech Coalition, supra,* 606 U.S. 461, heightened scrutiny is warranted when the government chooses to regulate an unprotected form of speech in a manner that incidentally burdens protected forms of speech. The overarching principle we draw from these authorities is that even if the reason defamation is proscribable applies with special force in the context of false complaints against police officers, that does not license the Legislature to remedy those harms through a

mechanism that unnecessarily deters citizens from filing *truthful* (or at least well-intentioned) complaints.[16]

Thus, even assuming section 832.5's investigation requirements can be said to create a particularly injurious form of defamation that would justify some forms of content-based regulations involving false complaints against police, that does not alter our conclusion that the means the Legislature chose here raise constitutional concerns due to their potential to excessively deter *truthful* (or at least well-intentioned) criticism of the government. (See *Alvarez, supra*, 567 U.S. at p. 723, plur. opn. of Kennedy, J.; *id.* at p. 736, conc. opn. of Breyer, J.; *Free Speech Coalition, supra*, 606 U.S. 461.)

Similarly, we do not read *R. A. V.*'s second category of regulations — speech-based restrictions "aimed only at the 'secondary effects' of the speech" (*R. A. V., supra*, 505 U.S. at p. 394) — as creating a bright-line rule that immunizes from heightened scrutiny any content discrimination within a proscribable class of speech that targets the secondary effects of speech. Indeed, *Renton, supra*, 475 U.S. 41, which *R. A. V.*

---

[16] Surely the First Amendment must impose *some boundaries* on the government's authority to regulate what it perceives as a particularly harmful subset of proscribable speech. Assume, for example, that the Legislature passed a law requiring the formal investigation of any claim of misconduct filed against a state representative. Would that justify a law imposing a mandatory 20-year prison sentence for any knowingly false complaint of misconduct filed against a state representative? Would it justify a law that required complainants, in order to file such a complaint, to travel personally to Sacramento and take a sworn oath to tell the truth while standing in front of no less than fifty witnesses on the Capitol steps?

repeatedly cites (see *R. A. V.*, at pp. 389, 394), and other First Amendment cases addressing the secondary effects doctrine make clear that even regulations aimed at the secondary effects of speech cannot be designed in a manner that unduly interferes with speech itself.  (See *Alameda Books* (2002) 535 U.S. 425, 434, plur. opn. of O'Connor, J. [ordinance targeting secondary effects will be upheld only if government demonstrates that "reasonable alternative avenues of communication remain[] available"].)  And again *Alvarez*, *supra*, 567 U.S. 709, and *Free Speech Coalition*, *supra*, 606 U.S. 461, now make clear that even well-intentioned regulations that target falsity or that target unprotected categories of speech can trigger heightened scrutiny when they are structured in a manner that risks unduly burdening protected forms of speech.  We see no reason why a different rule should apply to well-intentioned content-based regulations that are meant to target only the secondary effects of speech.  For the reasons discussed above, to the extent section 148.6(a) can be properly characterized as being aimed only at the secondary effects of false complaints of police misconduct, the means that the Legislature chose to remedy those secondary effects still pose a sufficient threat of deterring a core form of protected speech so as to warrant additional scrutiny.

Finally, *R. A. V.'s* third category — which *Stanistreet* coined as a "catchall" (*Stanistreet*, *supra*, 29 Cal.4th at p. 509) — applies to content-based regulations that do not present any "realistic possibility" of "suppressi[ng]" any disfavored viewpoints (*R. A. V., supra*, 505 U.S. at p. 390) or burdening any protected forms of speech (see *Free Speech Coalition*, *supra*, 606 U.S. at pp. 482–483, 495; see also *Alvarez*, *supra*, 567 U.S. at pp. 709, 723, plur. opn. of Kennedy, J.; *id*. at p. 736, conc. opn.

of Breyer, J.). With the benefit of subsequent case law, we construe this "general exception" (*id.* at p. 393) as merely recognizing that there might be some forms of content regulation within proscribable classes of speech where the potential for favoring certain viewpoints or burdening protected forms of speech are so obviously remote as to warrant no further scrutiny. As an example, the high court posited that it could "not think of any First Amendment interest that would stand in the way of a State's prohibiting only those obscene motion pictures with blue-eyed actresses." (*R. A. V.*, at p. 390.)

*Stanistreet* concluded that *R. A. V.*'s "catchall" applied because section 148.6(a) does "not suppress[] all complaints of police misconduct, only knowingly false ones." (*Stanistreet*, *supra*, 29 Cal.4th at p. 509.) Thus, the *Stanistreet* majority appears to have reasoned that knowingly false complaints of official misconduct do not contribute to the marketplace of ideas. While that conclusion may have been sound based on the precedent that *Stanistreet* had available to it, subsequent case law indicates that when evaluating a statute that discriminates on the basis of content within a proscribable category of speech, courts should additionally consider whether the statute incidentally burdens protected speech. (See *Free Speech Coalition*, *supra*, 606 U.S. at pp. 482–483; cf. *Alvarez*, *supra*, 567 U.S. at pp. 709, 723, plur. opn. of Kennedy, J.; *id.* at p. 736, conc. opn. of Breyer, J.) Thus, contrary to *Stanistreet*'s suggestion, the fact that section 148.6(a) only regulates knowingly false claims of police misconduct does not foreclose the possibility that it does so in a manner that consequentially burdens protected speech, thus warranting heightened scrutiny.

For the reasons explained in detail above, while true that section 148.6(a) targets "only knowingly false" claims of misconduct (*Stanistreet, supra,* 29 Cal.4th at p. 509), the elements of the statute nonetheless present a consequential risk of deterring protected speech (truthful or not knowingly false complaints against police). (See *ante*, at pp. 39–49; *Stanistreet, supra,* 29 Cal.4th at pp. 513–514, conc. opn. of Werdegar, J.; *Hamilton II, supra,* 325 F.Supp.2d at p. 1094.) While we express no view whether any of these elements might unduly burden speech when considered in isolation, we think it clear that, considered together, they "threaten censorship of ideas" (*R. A. V., supra,* 505 U.S. at p. 393) by dissuading individuals from making truthful (or at least well-intentioned) complaints. As a result, *R. A. V.*'s "general exception" (*R. A. V., supra,* 505 U.S. at p. 393) is inapplicable.[17]

---

[17] It also bears noting that section 148.6(a)'s restriction on knowingly false claims against police officers is far afield from the example that the high court provided to illustrate a form of regulation that would fall within the catchall — i.e., a statute that "prohibit[s] only those obscene motion pictures with blue-eyed actresses." (*R. A. V., supra,* 505 U.S. at p. 390.) That example hypothesizes a category of regulation (no persons with blue eyes) that cannot conceivably suppress any viewpoints or ideas associated with the type of speech to which the regulation applies (obscene motion pictures). Unlike a law that targets police complaints, eye color cannot possibly be associated with a specific viewpoint. Section 148.6(a), in contrast, has numerous features that raise a substantial risk of deterring not only knowingly false complaints against police, but truthful (or well-intentioned) ones as well.

### d.  The dissent

The dissent concludes that section 148.6(a) should not be subject to any form of heightened constitutional scrutiny.  We disagree.

### i.  Alvarez *did not establish a new category of proscribable speech*

The dissent argues that heightened scrutiny is unwarranted because section 148.6(a) constitutes a regulation on falsity that is intended to " 'protect the integrity of [g]overnment processes.' "  (Dis. opn. of Liu, J., *post*, at p. 3, quoting *Alvarez*, *supra*, 567 U.S. at p. 709, plur. opn. of Kennedy, J.)   In the dissent's view, this qualifies as a " ' " 'historic and traditional categor[y] [of expression]' " ' where 'content-based restrictions on speech have been permitted.' "  (Dis. opn. of Liu, J., *post*, at p. 3.)  We are not aware of any authority that has categorized falsities that threaten the " 'integrity of government processes' " (*ibid*.) as one of "the few ' "historic and traditional categories [of proscribable speech] long familiar to the bar." ' "  (*Alvarez*, at p. 709, plur. opn. of Kennedy, J., quoting *Stevens*, *supra*, 559 U.S. at p. 468.)  The sole authority the dissent cites in support of that conclusion is the plurality opinion in *Alvarez*.  (See dis. opn. of Liu, J., *post*, at p. 3.)

The dissent's reliance on *Alvarez* is notable not only because plurality opinions do not constitute binding precedent (as they do "not represent the views of a majority of the Court" (*CTS Corp. v. Dynamics Corp. of America* (1987) 481 U.S. 69, 81), but also because we find nothing in the *Alvarez* plurality indicating that it intended to proclaim a new category of proscribable speech.  While it is true that the plurality signaled

approval of statutes that "prohibit falsely representing that one is speaking on behalf of the Government" and described those statutes as "protect[ing] the integrity of Government processes" (*Alvarez, supra,* 567 U.S. at p. 721, plur. opn. of Kennedy, J.), we do not view those comments as endorsing an expansion of the " 'well-defined and narrowly limited classes of speech' " that have historically been deemed proscribable. (*Stevens, supra,* 559 U.S. at pp. 468–469.) As the *Alvarez* plurality acknowledged later in its opinion, the Supreme Court has consistently rejected any " 'freewheeling authority to declare new categories of speech outside the scope of the First Amendment,' " and will do so only when "presented with 'persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription.' " (*Alvarez,* at p. 722, plur. opn. of Kennedy, J.) Against that backdrop, we are doubtful that the plurality's reference to the purpose of statutes that prohibit falsely representing oneself as a government actor was meant to endorse a new proscribable category of speech. Indeed, in the intervening decade since it was decided, we are not aware of any decision that has read *Alvarez* so broadly.[18]

---

[18] We do not dispute that the *Alvarez* plurality signaled the constitutional validity of many existing restrictions on falsity that can be said to protect government processes, including sections 1001 and 912 of the United States Code. (See *Alvarez, supra,* 567 U.S. at pp. 720–721, plur. opn. of Kennedy, J.; accord dis. opn. of Liu, J., *post,* at pp. 5–6.) We disagree, however, with the dissent's further assertion that the plurality reached that conclusion by creating a new category of proscribable speech, i.e., false statements that can be said to threaten " 'the integrity

In our view, the only category of proscribable speech that section 148.6(a) implicates is defamation. More specifically, as we have construed it (and as *Stanistreet* construed it), section 148.6(a) regulates a subset of defamatory speech consisting of allegations of professional misconduct targeted at law enforcement agents. As discussed above, *R. A. V.* makes clear that heightened scrutiny may apply to content-based regulations within a proscribable class of speech. (See *R. A. V.*, *supra*, 505 U.S. at p. 387 ["the First Amendment imposes . . . a 'content discrimination' limitation upon a State's prohibition of proscribable speech"].) And while *Stanistreet* and the parties' briefing in this case focus squarely on *R. A. V.*, the dissent makes no mention of the allowance for the potential application of heightened scrutiny that *R. A. V.* established in this context. Nor does the dissent discuss the high court's recent decision in *Free Speech Coalition*, *supra*, 606 U.S. 461, which confirms that heightened scrutiny applies to statutes that regulate

---

of [g]overnment processes.' " (Dis. opn. of Liu, J., *post*, at p. 3.) We are not aware of any authority that has endorsed that novel proposition.

While it may be that many prohibitions on falsity that protect the integrity of government processes are valid because they are *sufficiently circumscribed to achieve that purpose* (see *Alvarez, supra*, 567 U.S. at p. 721, plur. opn. of Kennedy, J. [describing 18 U.S.C. §§ 1001 and 912 as "*targeted* prohibitions"], italics added), we find nothing in the *Alvarez* plurality that suggests such laws are categorically immune from constitutional scrutiny because they regulate a class of speech that qualifies as one of "the few ' "historic and traditional categories [of expression] long familiar to the bar." ' " (*Alvarez*, at p. 717, plur. opn. of Kennedy, J., quoting *Stevens, supra*, 559 U.S. at p. 468.)

proscribable speech in a manner that incidentally burdens protected speech.

Instead, the dissent grounds its defense of the statute in the proclamation of a new category of proscribable speech that no party in this long-running litigation has ever proposed and that no court has ever endorsed.

### ii. The chilling effect of section 148.6(a)

The dissent's second line of reasoning is that it sees no risk (or at least no consequential risk) that the features of section 148.6(a) — particularly its admonition requirement — would deter anyone from making a "good-faith complaint[]." (Dis. opn. of Liu, J., *post*, at p. 11.)

In support, the dissent argues that while focusing on the admonition's threat of criminal liability, our analysis ignores additional language in the admonition explaining that while the agency may ultimately find there is not enough evidence to take action on the complaint, the complainant still has the right to " 'make the complaint and have it investigated.' " (Dis. opn. of Liu, J., *post*, at p. 11, quoting § 148.6(a)(2).) According to the dissent, this additional language "distinguishes between a good-faith complaint that lacks 'enough evidence' and 'a complaint that you know to be false.' " (Dis. opn. of Liu, J., *post*, at p. 11.) The dissent further reasons that because a well-intentioned complainant would "know" they are acting in good faith, and not making "a complaint [they] know[] to be false" (*ibid.*), there is no reasonable risk they would be deterred.

In our view, however, telling complainants that they have a right to make a good-faith allegation of misconduct even if it is ultimately deemed to be supported by insufficient evidence

does little to mitigate the deterrent effect of then immediately telling them, *but if we think you are lying, you can be charged with a crime.* The problem with the dissent's argument is that it assumes that simply because the complainant *believes* that what they are saying is true — and because they have been told that acting in good faith is not a crime — then they should have no reason to be deterred from complaining. But as Justice Werdegar explained, allegations involving police misconduct will frequently "come down to the word of the citizen against the word of the police officer" (*Stanistreet*, *supra*, 29 Cal.4th at p. 513, conc. opn. of Werdegar, J.), and the admonition makes prospective complainants acutely aware that they could face "criminal prosecution and the burden and expense of retaining a defense attorney" if authorities think they are being knowingly untruthful. (*Id.* at p. 514.) Under such circumstances, "some complainants are likely to choose *not* to go forward." (*Ibid.*)

The dissent disagrees with that line of reasoning. The fact that it may be a complainant's word against a police officer's does not alter the dissent's view. Nor does the fact that before citizens are even allowed to make a complaint, they are told they may face criminal prosecution if their statements are deemed knowingly untruthful. The fact that the entity that will make a determination of falsity for purposes of effectuating an arrest may, in the first instance, be the very entity that the person is complaining about? The dissent is unpersuaded. The fact that there is no materiality requirement in the admonition? This, too, does not alter the dissent's view because the average person will understand that materiality is inherent in its terms. (See dis. opn. of Liu, J., *post*, at pp. 15–16.) The language of the

criminal provision does not even match the language of the admonition?  Mere " 'worldplay,' " says the dissent.  (*Id.* at p. 15.) Some might construe the scope of the statute to be vague and ill-defined?  That should only "*increase* the latitude for citizens to make complaints in good faith" (*id.* at pp. 14–15) argues the dissent, turning First Amendment jurisprudence on its head. (See *Grayned v. City of Rockford* (1972) 408 U.S. 104, 109 ["where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'   Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked' "], fns. omitted; see also RIPA Annual Report 2025, *supra*, at p. 170 [section 148.6(a) "could have a chilling effect on members of the public . . . especially since there are no statutory limitations on what types of 'false' allegations that could result in prosecution"].)  We take a different view:  The question we must ask is whether the average person might be deterred from making even a truthful report of wrongdoing (or at least not a knowingly false one) when they are admonished with the threat of criminal prosecution — and required to sign a document attesting to that admonishment — before they are allowed to complain.  We believe the answer to that question is clearly yes.

The dissent contends, however, that a report showing that thousands of misconduct claims were filed in 2018 and ultimately determined to be " 'unfounded' " belies any claim that citizens are deterred from pursuing complaints.  (Dis. opn. of Liu, J., *post*, at p. 12.)  The dissent appears to reason that because many citizens were willing to come forward with complaints in 2018 that could not ultimately be substantiated,

it is unlikely that section 148.6(a)'s admonition requirement deters civilian complaints in any meaningful way. But the fact that thousands of complaints were filed and deemed unfounded (in a state with a population of 40 million) tells us little about how many people may have been deterred from filing complaints in the first instance.[19]

The dissent next argues that our concerns regarding the deterring effects of section 148.6(a) are overstated because the dissent has identified some jurisdictions that allow the signed admonition to be submitted online. (Dis. opn. of Liu, J., *post*, at p. 13 & appen.) As a preliminary matter, California is comprised of over 500 law enforcement agencies. (See RIPA Annual Report 2025, *supra*, at p. 18.) Thus, while true that some jurisdictions have voluntarily chosen to allow complainants to file their allegations online (perhaps recognizing how intimidating it may be to file in person), there has been no showing that all jurisdictions do so and the RIPA Board's findings imply otherwise.[20] (See RIPA Annual Report

---

[19] The dissent appears to limit its argument to statistics from 2018 because most of the largest law enforcement agencies in California — indeed 10 of the 15 largest — do not currently include the admonition language in their complaint forms and many have not been doing so since at least 2020. (See RIPA Annual Report 2025, *supra*, at pp. 171–172 & fn. 650.) Given that a vast majority of our largest law enforcement agencies are not employing the admonition, any more recent complaint statistics are particularly unhelpful.

[20] The RIPA Board was established under The Racial and Identity Profiling Act of 2015 (Stats. 2015, ch. 466, § 4) "for the purpose of eliminating racial and identity profiling, and improving diversity and racial and identity sensitivity in law

2020, at p. 70 <https://oag.ca.gov/sites/all/files/agweb/pdfs/ripa/
ripa-board-report-2020.pdf> [as of Nov. 10, 2025] (RIPA Annual
Report 2020) [indicating that some jurisdictions may have low
numbers of reported complaints because "individuals . . . are
required to . . . bring in complaints in person"].)  While laudable
that some law enforcement agencies have elected to implement
the statute in a less speech-deterring manner, that is cold
comfort to residents who live in jurisdictions where that may not
be the case.

　　More crucially, even if the initial complaint is submitted
online, that would not seem to end the complainant's
participation in the matter.  The language of the admonition and
text of section 832.5 both make clear that the law enforcement
agency has an *obligation* to conduct a follow-up investigation.
As the dissent expressly acknowledges, some law enforcement
agencies "require an in-person interview for a filed complaint to
go forward."  (Dis. opn. of Liu, J., *post*, at p. 13.)  And even in
those jurisdictions that do not mandate an in-person interview,
the complainant would presumably (at least in most cases) be
required to speak with an investigating law enforcement agent
in some capacity.  And the admonition makes complainants well

---

enforcement."  (§ 13519.4, subd. (j)(1).)  The board is made up of
representatives of law enforcement, appointees from the
legislative and executive branches, attorneys, and community
members, spiritual leaders and academics who specialize in
policing and racial profiling.  (See *id.* at subd. (j)(2).)  The RIPA
Board is required to conduct "evidence-based research" (*id.* at
subd. (j)(3)(D)) on various police practices and issue an annual
report making policy recommendations for eliminating racial
and identity profiling (*id.* at subd. (j)(3)(E)).

aware they can be charged with a crime if the investigator thinks they are being knowingly untruthful.

The dissent similarly argues that any risk of deterrence is mitigated by the fact that law enforcement "agencies commonly have structures designed to protect the integrity of investigations." (Dis. opn. of Liu J., *post*, at p. 14.) Again, however, while some agencies may have such "structures" (*ibid*.) in place (the dissent identifies only four such agencies), the RIPA Board findings suggest that others likely do not. (See RIPA Annual Report 2020, *supra*, at pp. 67–70 [law enforcement agencies throughout California lack "a uniform system to accept, document, investigate, and report complaints"].) Nor are we persuaded that the average person would have any reason to know about those "structures" (e.g., that some counties may refer the complaint to an independent Internal Affairs Bureau Office or Inspector General) when deciding whether to move forward with a complaint. The admonition certainly does not inform them of any such safeguards.

The dissent also expresses confusion as to how deterring well-intentioned complaints of police misconduct could possibly be said to drive certain ideas or viewpoints from the public sphere given that "complaints alleging misconduct by a peace officer are generally confidential." (Dis. opn. of Liu J., *post*, at p. 18.) We think it clear, however, that when a regulation substantially burdens a citizen's ability to engage in protected speech that relates to the conduct of government officials — even speech that the larger public may not be privy too — heightened scrutiny is required. The fact that allegations within a complaint are generally confidential does nothing to alter the speech deterring effects of the statute.

On a more fundamental level, we simply disagree with the dissent's suggestion that there is no reason to believe that section 148.6(a)'s features — in particular its admonition requirement — create a risk of deterring well-intentioned reports of police misconduct. That is particularly true among residents of communities that have historically experienced "disproportionately . . . heightened levels of police scrutiny and racial profiling." (*People v. Flores* (2024) 15 Cal.5th 1032, 1054, conc. opn. of Evans, J.) As the dissent itself acknowledges, "[M]any people, especially members of minority, immigrant, or low-income communities" may be reluctant to pursue claims of police misconduct because "they may lack confidence their complaints will be taken seriously" or they "may distrust law enforcement." (Dis. opn. of Liu, J., *post*, at p. 4; cf. *Flores*, at pp. 1053–1055, conc. opn. of Evans, J.) The dissent nonetheless finds no risk — or at least no meaningful risk — that individuals who already harbor such concerns would be deterred by being told (in many cases in a police station by a police officer) that their complaint will not be accepted unless they agree to read and sign an admonition (written in all capital letters and in boldface print) warning that they may be charged with a crime if the law enforcement agency about whom they are complaining believes they are lying. The dissent is confident that this is "not a message of deterrence" (dis. opn. of Liu, J., *post*, at p. 11) and that our concerns amount to nothing more than "speculative assertions" (*id.* at p. 4). But the entire point of the admonition *is to deter*. While the statute explicitly seeks to deter only knowingly false allegations of misconduct, we think it entirely reasonable (and indeed probable) that threatening people with

prosecution under an ill-defined standard of falsity would also give pause to those with well-intentioned complaints.

We are not alone in that conclusion. The district court in *Hamilton II*, 325 F.Supp.2d 1087, for example, found that there is a "high likelihood" that subdivision (a)(2)'s admonition provisions "will cause individuals to refrain from filing a complaint against law enforcement officers." (*Id.* at p. 1094.) The court further found that, "Overall, [s]ection 148.6 creates a potent disincentive for citizens to file a complaint." (*Ibid.*) Multiple members of this court have expressed similar views. (See *Stanistreet*, *supra*, 29 Cal.4th at pp. 513–514, conc. opn. of Werdegar, J.; Moreno, J., joining [§ 148.6(a)'s criminal provision, coupled with its "unique" admonition requirement, will "[r]ealistically, [cause] some complainants . . . to choose *not* to go forward — even when they have legitimate complaints"].)

The Attorney General's RIPA Board (see § 13519.4, subd. (j); see *ante*, at p. 64, fn. 20), which includes several representatives of law enforcement (see *id.* at subds. (j)(2)(A), (C)–(F)), has also concluded that section 148.6(a)'s statutory scheme risks deterring reasonable citizens from coming forward with truthful complaints about police misconduct. In its most recent annual report, the RIPA Board recommended (as it has in every report since its inception) that "the Legislature delete or amend" section 148.6(a)(2)'s admonition requirement, explaining that the "the advisory language . . . could have a chilling effect on members of the public seeking to file a complaint, especially since there are no statutory limitations on what types of 'false' allegations that could result in prosecution. . . . [R]equiring a complainant to reveal their identity [by signing the advisory] even if they wish to remain

anonymous, could [also] deter members of the public from submitting valid complaints."[21]  (RIPA Annual Report 2025, *supra*, at pp. 170–171; see also RIPA Annual Report 2020, *supra*, at p. 74 ["requiring complaints to be signed, in writing, and under penalty of criminal prosecution may create an unnecessary chilling effect . . . particularly those that allege racial or identity profiling"].)  Those recommendations are consistent with guidance from the U.S. Department of Justice (U.S. DOJ).  (See Community Oriented Policing Services, U.S. DOJ, Standards and Guidelines for Internal Affairs, p. 17 <https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-p164-pub.pdf> [as of Nov. 10, 2025] ["[u]nless required by law, no threats or warning of prosecution or potential prosecution for filing a false complaint should be made orally or in writing to a complainant or potential complainant"].)

---

[21]  Several decisions highlight the potential concerns with section 148.6(a).  In *Hamilton I, supra*, 107 F.Supp.2d 1239, for example, the plaintiff brought a civil rights action alleging that he was repeatedly subjected to police misconduct but elected not to move forward with a citizen complaint after the watch commander questioned his story and read him the admonition required by section 148.6(a)(2).  And in *Cuadra, supra*, 2010 WL 55875, the defendant lodged a citizen's complaint alleging that he had been unlawfully stopped and beaten by several officers.  The officers denied the allegations, asserting that the defendant was intoxicated and had sustained his injuries by "repeatedly bash[ing] his head against the plastic divider."  (*Id.* at *1.)  The officers' supervisor conducted an investigation and ultimately believed the officers' story.  The defendant was thereafter charged under section 148.6(a), but the charges were later dismissed, and the defendant pursued a civil rights action against the city.

Although the RIPA Board includes numerous experts in law enforcement, the dissent discounts its findings regarding the potential deterrent effects of section 148.6(a)(2) (and apparently the guidance of the U.S. DOJ) because those findings were unaccompanied by empirical evidence such as "community surveys." (Dis. opn. of Liu, J., *post*, at p. 17.) The dissent contends that we should not (and indeed cannot) conclude that section 148.(6) burdens speech in the absence of "evidence" (dis. opn. of Liu, J., *post*, at p. 17) — presumably statistical evidence or the like — confirming that the admonition risks deterring well-intentioned complaints of police misconduct. That approach, however, finds no support in the law. In the recently decided *Free Speech Coalition*, *supra*, 606 U.S. 461, for example — again a case the dissent does not reference — the high court did not require any statistical proof or other "evidence" that an age-verification requirement might deter adults from accessing sexually explicit websites as a precondition of finding that the regulation warranted heightened scrutiny. That decision is consistent with other cases in which our high court has considered the potential deterring effects of speech regulations without looking to the type of empirical evidence the dissent appears to call for here. (See, e.g., *Multimedia Holdings Corp. v. Circuit Court of Florida, St. Johns County* (2005) 544 U.S. 1301, 1304 ["A threat of prosecution . . . raises special First Amendment concerns, for it may chill protected speech . . . by putting that party at an added risk of liability"]; *Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.* (1996) 518 U.S. 727, 754 [written notice requirement would "restrict viewing by subscribers who fear for their reputations should the operator

. . . inadvertently[] disclose the list of those who wish to watch [explicit content]"].)

We join the many voices who have previously concluded that as currently structured, section 148.6(a) presents a meaningful risk of deterring a core form of protected speech — well-intentioned reports of police misconduct — thus warranting heightened scrutiny.

### iii. Additional arguments

The dissent additionally argues that section 148.6(a) is no different than statutes that "make it a crime to commit perjury" or to "lie to a government official concerning an official matter." (Dis. opn. of Liu, J., *post*, at p. 3.) Such statutes, however, merely target — *in a neutral manner* — the act of lying about any material issue during a particular form of proceeding. They do not single out for special treatment lies that target a particular category of government employment. The more apt comparison would be a law barring perjury *that relates to the misconduct of a government official.* And these laws certainly do not require that, as a condition of filing a formal complaint against a government employee, the complainant must sign an admonition warning that they can be charged with a crime if their allegations are deemed to be knowingly false.

The dissent also notes that section 148.6(a)(1)'s criminal provision only applies when a person files a knowingly false allegation of misconduct that triggers the citizen complaint procedure and thus leaves unregulated claims of misconduct conveyed in any number of other mediums, such as a "blog post, viral email, or TikTok." (Dis. opn. of Liu, J., *post*, at p. 6.) But as we have explained above, the fact that section 148.6(a) does

not regulate all forms of statements concerning police misconduct does little to negate our concerns regarding the burdens the statute places on the most accessible and effective mode of reporting police misconduct that is available to the citizens of California. (See *ante*, at p. 48.) While the statute may not chill what a person chooses to say about police misconduct in a Tik Tok video, the fact that it risks chilling what a person might report to the *government* (who has a duty to investigate such reports) nonetheless raises constitutional concerns.

    3. *Section 148.6 is not narrowly tailored to achieve its purposes*

Because section 148.6(a) constitutes a content-based regulation within a proscribable category of speech that presents a consequential risk of suppressing a core form of protected speech, further constitutional scrutiny is warranted. The level of scrutiny that applies to a regulation like section 148.6(a), which discriminates on the basis of content within a proscribable category of falsehood (defamation), is somewhat uncertain. While *R. A. V.* applied strict scrutiny to the content-based regulation before it, that regulation was expressly deemed to discriminate on the basis of *viewpoint* — "a 'more blatant' and 'egregious [subclass] of content discrimination.' " (*Reed, supra*, 576 U.S. at p. 168.) In this case, the primary concern with section 148.6(a) is not that it disfavors any particular viewpoint (as the statute in *R. A. V.* did), but rather its incidental burden on protected forms of speech.

Moreover, section 148.6(a) does not *directly* regulate any protectable form of speech. Rather, as we have construed it, the statute only criminalizes malicious defamatory falsehoods. (See

*ante*, at pp. 33–34.) Thus, unlike many forms of content-based regulations, the constitutional concern here is not that the state is attempting to regulate a protected form of speech or that the statute is written in such a manner that it sweeps protected speech within its actual prohibitions. Rather, the concern is that the means the state has selected to regulate a proscribable form of speech risks *deterring* citizens from engaging in a protected form of speech. The high court's recent opinion in *Free Speech Coalition*, *supra*, 606 U.S. 461, suggests that under such circumstances, intermediate scrutiny is generally the appropriate standard of review. (*Id.* at pp. 482–483, 495.)

For purposes of this case, it is ultimately immaterial whether intermediate or strict scrutiny applies because we conclude that section 148.6(a) cannot survive even the less exacting standard of intermediate scrutiny. (See *Packingham*, *supra*, 582 U.S. at p. 105 ["Even making the assumption that the statute is . . . subject to intermediate scrutiny, the provision cannot stand"]; *McCutcheon v. FEC* (2014) 572 U.S. 185, 199, plur. opn. of Roberts, C. J. [because the statute "fail[s] even under the [less demanding] test," the court "need not parse the differences between the two standards in this case"].) "In order to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.' [Citation.] In other words, the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " (*Packingham*, at pp. 105–106; accord *Free Speech Coalition*, *supra*, 606 U.S. at p. 471.) "[T]hese standards ensure . . . that the [government's] interests are proportional to the resulting burdens placed on speech." (*Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 572; accord *Free Speech Coalition*, at p. 471;

72

*Alvarez, supra,* 567 U.S. at p. 730, conc. opn. of Breyer, J.) [in the context of falsity, intermediate scrutiny requires the court "to determine whether the statute works speech-related harm that is out of proportion to its justifications"].)

Applying those standards here, we find that the government has a significant interest in deterring knowingly false complaints of misconduct levied against police officers. As detailed in the legislative history, section 148.6(a) was passed in response to a substantial increase in false claims of misconduct that were causing professional and reputational harm to law enforcement officers (and resulting in the unnecessary expenditure of public funds) due to section 832.5's investigation requirements. The state has a legitimate interest in curbing abusive false complaints of police conduct, the negative effects of which take on added significance because of the statutory investigation requirements.

We are not persuaded, however, that section 148.6(a) has been crafted in a manner that " 'does not burden substantially more speech than necessary to further those interests.' " (*Free Speech Coalition, supra,* 606 U.S. at p. 471.) While the objective of curbing abusive false claims of police misconduct is sound, the means the Legislature chose to accomplish those objectives — an ill-defined criminal provision that is accompanied by an unusual admonition requirement — unnecessarily risk chilling substantially more speech than is necessary to further the government's interests. Indeed, there would seem to be any number of other, less speech-deterring ways of addressing the

reputational and professional harms that may be caused by section 832.5's investigation process.[22]

The Legislature might, for example, provide peace officers heightened procedural protections that insulate them against the potentially damaging professional effects of false complaints. (See Gov. Code, §§ 3300–3313 [the Public Safety Officers Procedural Bill of Rights Act]; § 832.5, subd. (c) [any complaints that are found to be frivolous, unfounded, or exonerated are not maintained in the officer's personnel file].) Alternatively, it might "more finely tailor[]" (*Alvarez*, *supra*, 567 U.S. at p. 738, conc. opn. of Breyer, J.) the scope of subdivision (a)(1)'s criminal provision by, among other possibilities, "insist[ing] upon a showing that the false statement caused specific harm" (*Alvarez*, at p. 738, conc. opn. of Breyer, J.) or including a materiality requirement (see *Animal Legal Defense Fund*, *supra*, 8 F.4th at p. 787). The statute's criminal provision and its attendant admonition requirement might more precisely (and consistently) define what form of allegations might trigger criminal liability. The statute might treat knowingly false statements made in the context of a police misconduct investigation more even-handedly, which would seem to accord with the state's claims that section 148.6(a) is intended (at least in part) to protect the integrity of the complaint investigation process. And perhaps most crucially, the Legislature might amend the admonition

---

[22] The parties have not identified any other state statute that criminalizes knowingly false allegations of police misconduct while conditioning acceptance of any such complaint on signing the type of admonition at issue here.

requirement in a manner that is less speech deterring.[23]  While we express no view as to whether any of these alternative approaches would be sufficient to survive constitutional scrutiny, we think it clear that the current structure of section 148.6(a) unnecessarily risks chilling substantially more speech than necessary to deter knowingly false allegations of misconduct against police officers.

Again, we acknowledge that the state has a legitimate interest in curbing the deleterious effects of false complaints against law enforcement.  (Accord dis. opn. of Liu, J., *post*, at p. 6.)  And like the dissent, we reaffirm *Stanistreet*'s conclusion that the Legislature has the authority "to protect the integrity of complaint procedures by . . . deterring abuse."  (Dis. opn. of Liu, J., *post*, at p. 6; see *Stanistreet*, *supra*, 29 Cal.4th at p. 510.)  Unlike the dissent (and *Stanistreet*), however, we conclude that as presently drafted section 148.6(a) "works disproportionate constitutional harm" (*Alvarez, supra,* 567 U.S. at p. 739, conc. opn. of Breyer, J.) by attempting to achieve those objectives in a manner that unduly chills a core form of protected speech — truthful or well-intentioned complaints of government misconduct.  It consequently fails intermediate scrutiny and thus violates the First Amendment.

---

[23]    The RIPA Board's most recent annual report shows that since at least 2020, many of the largest law enforcement agencies in California have omitted the advisory language set forth in section 148.6(a)(2) from their citizen complaint forms. (See RIPA Annual Report 2025, *supra*, at pp. 171–172.)  LAPPL has made no showing that these omissions have had any material effect on the number of abusive police complaints filed against agencies that have chosen not to include the admonition.

## III. Disposition

The Court of Appeal's judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**EVANS, J.**
**JENKINS, J.**[*]

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LOS ANGELES POLICE PROTECTIVE LEAGUE
v. CITY OF LOS ANGELES

S275272


Dissenting Opinion by Justice Liu


At least since the beating of Rodney King by officers of the Los Angeles Police Department in 1991, police misconduct has been a high-profile issue in California and throughout the nation. The concern has remained salient in light of many fraught and sometimes deadly police interactions with minority communities over the years. (See *People v Flores* (2024) 15 Cal.5th 1032, 1049; *id.* at pp. 1053–1054 (conc. opn. of Evans, J.); *People v. McWilliams* (2023) 14 Cal.5th 429, 451–452 (conc. opn. of Liu, J.); *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 30–31 (conc. opn. of Liu, J.).)

As one recourse, our Legislature requires every law enforcement agency to "establish a procedure to investigate complaints by members of the public against the personnel of these departments . . . , and . . . [to] make a written description of the procedure available to the public." (Pen. Code, § 832.5, subd. (a)(1); all undesignated statutory references are to the Penal Code.) Such procedures enable everyday citizens to report misconduct and hold officials accountable.

As important as these procedures are, they are also susceptible to abuse. Section 148.6 makes it a misdemeanor to "file[] any allegation of misconduct against any peace officer . . . knowing the allegation to be false." (§ 148.6, subd. (a)(1).) In addition, the statute requires any complainant to read and sign

1

an advisory that says in capital letters and boldface:  "YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER FOR ANY IMPROPER POLICE CONDUCT.  CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CIVILIANS' COMPLAINTS.  YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE.  THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY.  CIVILIAN COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.  [¶] IT IS AGAINST THE LAW TO MAKE A COMPLAINT THAT YOU KNOW TO BE FALSE.  IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE PROSECUTED ON A MISDEMEANOR CHARGE."  (*Id.*, subd. (a)(2).)

In enacting section 148.6, the Legislature observed that a "glaringly negative side-effect which has resulted [from the availability of complaint procedures] has been the willingness on the part of many of our less ethical citizens to maliciously file false allegations of misconduct against officers in an effort to punish them for simply doing their jobs.  [¶] Unfortunately for the officers, these complaints usually become a permanent part of their personnel jackets . . . .  Additionally, most of the officers find they have very little recourse against the complainants." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1732

(1995–1996 Reg. Sess.) April 18, 1995, at p. 1.) The statute "addresses the issue of knowingly making false allegations of misconduct against any peace officer. These false accusations can adversely affect the officer's position within the Department, and this legislation will discourage such false reports. [¶] . . . [¶] . . . For example, a Deputy Sheriff on a list for promotion to Sergeant receives a false report of misconduct, after which his promotion is deferred until the matter is resolved. After which, the complaint being found ungrounded, the Deputy has no recourse for any financial loss due to the delay." (*Id.* at p. 2.) Further, by deterring knowingly false complaints, the statute enables law enforcement agencies to focus on good-faith complaints, thereby saving time and resources. (Maj. opn., *ante*, at p. 12.)

The question is whether section 148.6 is an unconstitutional restriction on freedom of speech. The answer is simple: Section 148.6 is no more unconstitutional than laws that make it a crime to commit perjury, file a false police report, submit a false document to a public agency, or lie to a government official concerning an official matter. Such laws "protect the integrity of [g]overnment processes, quite apart from merely restricting false speech." (*United States. v. Alvarez* (2012) 567 U.S. 709, 721 (plur. opn. of Kennedy, J.) (*Alvarez*).) They belong to one of the " ' "historic and traditional categories [of expression]" ' " where "content-based restrictions on speech have been permitted." (*Id.* at p. 717.) Today's opinion invalidates section 148.6 on the ground that it "deter[s] citizens from filing truthful (or at least not knowingly false) complaints of police misconduct." (Maj. opn., *ante*, at p. 6.) But that

3

rationale rests on speculative assertions and does not withstand scrutiny.

To be sure, many people, especially members of minority, immigrant, or low-income communities, may be reluctant to file complaints. They may feel it is not their place to question authority; they may lack confidence their complaints will be taken seriously; they may distrust law enforcement; they may not know the process or have time to figure it out. These issues have long histories and many complexities quite apart from section 148.6, and for police agencies, there is perhaps no task more important than gaining the trust of the communities they serve. But trust is a two-way street, and our men and women in uniform have a hard enough job without having to deal with knowingly false allegations of misconduct. Because section 148.6 targets unprotected speech and has not been shown to pose a substantial risk of suppressing protected speech, I cannot agree that it violates the First Amendment.

## I.

As the high court has made clear, there is no "general exception to the First Amendment for false statements." (*Alvarez, supra,* 567 U.S. at p. 718 (plur. opn. of Kennedy, J.); see *id.* at pp. 733–734 (conc. opn. of Breyer, J.).) But our statutes and common law have long recognized categories of "knowing or reckless falsehood[s]" that may be proscribed without running afoul of the First Amendment. (*Alvarez*, at p. 719 (plur. opn. of Kennedy, J.).) These include defamation, fraud, perjury, and false statements made to a government official. (*Id.* at pp. 719–721; see *id.* at pp. 734–735 (conc. opn. of Breyer, J.).) The common denominator of such laws is not merely that they proscribe false speech, but that they protect

4

against "legally cognizable harm associated with a false statement." (*Id.* at p. 719 (plur. opn. of Kennedy, J.); see *id.* at p. 734 (conc. opn. of Breyer, J.) [such laws narrow the range of proscribed falsehoods "by specifying that the lies be made in contexts in which a tangible harm to others is especially likely to occur" or "by limiting the prohibited lies to those that are particularly likely to produce harm"].)

One subset consists of longstanding laws that protect the integrity of government processes. Perjury lacks First Amendment protection "not simply because perjured statements are false," but because "[p]erjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system." (*Alvarez*, *supra*, 567 U.S. at pp. 720–721 (plur. opn. of Kennedy, J.); see *United States v. Dunnigan* (1993) 507 U.S. 87, 97 ["the constitutionality of perjury statutes is unquestioned"].) The federal law prohibiting false statements to government officials, 18 U.S.C. § 1001, likewise "protect[s] the integrity of [g]overnment processes, quite apart from merely restricting false speech." (*Alvarez*, at p. 721 (plur. opn. of Kennedy, J.); see *ibid.* [same for "[s]tatutes that prohibit falsely representing that one is speaking on behalf of the Government, or that prohibit impersonating a Government officer," such as 18 U.S.C. §§ 709, 712, 912].) The same is true of state laws making it a crime to submit a false document to a public agency (§ 115), file a false police report (§ 118.1), or offer false evidence in a trial or official investigation (§ 132). This is not "a new category of proscribable speech." (Maj. opn., *ante*, at p. 60.) In "our law and tradition," such prohibitions have not been viewed as "somehow vulnerable"

under the First Amendment.  (*Alvarez*, at p. 721 (plur. opn. of Kennedy, J.); see *id.* at pp. 734–735 (conc. opn. of Breyer, J.).)

Section 148.6 falls squarely within this category.  It prohibits an individual from filing an allegation of peace officer misconduct "knowing the allegation to be false."  (§ 148.6, subd. (a)(1).)  The "knowing" limitation is significant; the statute does not punish the filing of a good-faith allegation that turns out to be false or unsubstantiated.  Further, the statute targets a knowingly false "allegation of misconduct" (*ibid.*); it does not apply to a false statement that is immaterial to a misconduct allegation.  And critically, the statute is only triggered when a person "files" (*ibid.*) a knowingly false allegation of misconduct pursuant to a citizen complaint procedure.  If a person lies about a police officer's conduct in a blog post, viral e-mail, or TikTok video, the law of defamation may have something to say.  But section 148.6 does not.  In this respect, section 148.6 could not be more different from the law held unconstitutional in *Alvarez*, which criminalized lying about having been awarded the Congressional Medal of Honor whether in the public square or "within a home," "whether shouted from the rooftops or made in a barely audible whisper."  (*Alvarez*, *supra*, 567 U.S. at pp. 722, 723 (plur. opn. of Kennedy, J.); see *id.* at pp. 722–723 ["The statute seeks to control and suppress all false statements on this one subject in almost limitless times and settings."].)

Section 148.6 is not a general prohibition on defaming peace officers; it is a narrow measure that targets knowing abuse of an official process.  Under California law, every complaint of misconduct filed against a peace officer must be investigated (§ 832.5), and "[c]omplaints and any reports or findings relating to these complaints . . . shall be retained for a

period of no less than 5 years" (*id.*, subd. (b)). Although complaints determined to be unfounded may not be used for punitive or promotional purposes (*id.*, subd. (c)(2)), the mere fact of an investigation may delay an officer's promotion or cast a cloud over the officer's standing in the department. (*Ante*, at pp. 2–3.) Although complaints are not filed under oath, the statute requires complainants to read and sign the advisory quoted above. Complaints in this context are thus similar to sworn testimony in that they have "the formality and gravity necessary to remind the [complainant] that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." (*Alvarez, supra*, 567 U.S. at p. 721 (plur. opn. of Kennedy, J.).)

The law takes seriously any complaint filed against a peace officer, and the Legislature was well within its prerogative to protect the integrity of complaint procedures by punishing and deterring abuse. Section 148.6 is compatible with the First Amendment for the same reason that perjury statutes and other laws against false statements in official proceedings have long endured. These laws are of " 'unquestioned constitutionality' " because they safeguard the integrity of government processes that inform legal judgments or official actions. (*Alvarez, supra*, 567 U.S. at p. 720 (plur. opn. of Kennedy, J.), quoting *United States v. Grayson* (1978) 438 U.S. 41, 54.)

## II.

In *Chaker v. Crogan* (9th Cir. 2005) 428 F.3d 1215 (*Chaker*), the Ninth Circuit held section 148.6 unconstitutional on the ground that it "discriminates on the basis of a speaker's viewpoint" (*id.* at p. 1217) by "holding . . . citizen *complainants* accountable for their knowing falsehoods, while leaving

unregulated the knowingly false speech of a peace officer or witness" (*id*. at p. 1226). Today's opinion similarly asserts that section 148.6 "is asymmetrical in its application, criminalizing knowingly false complaints filed against law enforcement personnel — and expressly requiring complainants be told of that possibility — while leaving unregulated (and requiring no admonition against) knowingly false claims that a witness might make against the complainant during any ensuing investigation." (Maj. opn., *ante*, at pp. 40–41; cf. *R. A. V. v. St. Paul* (1992) 505 U.S. 377, 391 (*R. A. V.*) [invalidating local ordinance that targeted a subset of proscribable hate speech because it went "beyond mere content discrimination, to actual viewpoint discrimination"].)

It is true that section 148.6 does not apply to knowingly false statements made by police officers. But section 148.6 does not exist in a vacuum. Section 118.1, which was originally enacted in 1990 (Stats. 1990, ch. 950, § 3) and repealed and added as revised in 2021 (Stats. 2021, ch. 267, §§ 1, 2), makes it a crime for any peace officer to "knowingly and intentionally" "fil[e] a false report." (§ 118.1, subd. (a); see *ibid.* ["[e]very peace officer" is "guilty of filing a false report" if the officer makes any material statement in a peace officer report or gives any such statement "to another peace officer and the statement is included in a peace officer report, regarding the commission or investigation of any crime, knowing the statement to be false"]; *id.*, subd. (b) [where a statement is made by another person, "the peace officer writing or making the report" is criminally liable if the officer "knows the statement to be false and is including the statement to present the statement as being true"].) Several courts have sustained charges or upheld convictions of law

enforcement officers under section 118.1 for filing false reports. (See *People v. Kim* (2024) 99 Cal.App.5th 857, 861–862, 869; *People v. Singleton* (2010) 182 Cal.App.4th 1, 5, 22; *People v. Jimenez* (Mar. 19, 2007, B186124) [nonpub. opn.]; *People v. Scarsella* (Jan. 3, 2006, C048011) [nonpub. opn.].)

When a complaint is made against an officer, the officer will typically have to put his or her version of events into a report or give a statement to an investigating officer to be included in a report. (E.g., *Cuadra v. City of South San Francisco* (N.D.Cal., Jan. 4, 2010, No. C08-3439 TEH) 2010 WL 55875 (*Cuadra*) [after Cuadra claimed police officers used excessive force when arresting him, the officers prepared a report on the arrest and investigation of Cuadra's complaint].) A knowing falsehood would expose the officers to criminal liability under section 118.1, which provides for more severe punishment than section 148.6. (Cf. § 118.1, subd. (a) [up to three years in prison] with §§ 148.6, 19 [up to six months in jail].) There is no asymmetry when section 148.6 is considered alongside section 118.1; if anything, the stiffer penalty provided by section 118.1 means the officer faces greater risk than the complainant. Today's opinion does not dispute this point.

Further, although section 148.6 does not proscribe knowingly false statements by a witness "against the complainant" (maj. opn., *ante*, at p. 40), the statute also does not proscribe knowingly false statements by a witness *in support of* the complainant. The court does not dispute this point either. And witness statements in either direction, to the extent they are to be used as evidence, are subject to ordinary laws against false evidence. (§§ 118, 132.) While those laws have limitations (maj. opn., *ante*, at p. 42, fn. 12), that is equally true whether

they are applied to witness statements for or against the complainant, or for or against the accused officer. The rules governing witness statements are evenhanded and do not leave a complainant more exposed to liability under section 148.6 than an officer is exposed under section 118.1.

In sum, knowingly false witness statements against either the complainant or the officer are on equal footing, as are knowingly false statements by either the complainant or the officer. Where is the asymmetry?

## III.

The crux of the court's reasoning today is that several features of section 148.6, considered together, " 'threaten censorship of ideas' [citation] by deterring citizens from filing truthful (or at least not knowingly false) complaints of police misconduct." (Maj. opn., *ante*, at p. 6.) "[A]symmetrical" application is purportedly one of the features (*id.* at p. 40), but as discussed, there is no asymmetry.

"More troubling still," the court says, "section 148.6(a)(1)'s criminal provision is accompanied by an admonition requirement that contains various speech deterring elements." (Maj. opn., *ante*, at p. 42.) In elaborating this concern, the court focuses on the advisory's last two sentences: "IT IS AGAINST THE LAW TO MAKE A COMPLAINT THAT YOU KNOW TO BE FALSE. IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE PROSECUTED ON A MISDEMEANOR CHARGE." (§ 148.6, subd. (a)(2); see maj. opn., *ante*, at pp. 42–43.) But the court conspicuously omits the advisory's first four sentences: "YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A

POLICE OFFICER FOR ANY IMPROPER POLICE CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CIVILIANS' COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY." (§ 148.6, subd. (a)(2).)

The advisory twice informs the reader that "you have the right to make a complaint" (or "the complaint"). (§ 148.6, subd. (a)(2), capitalization omitted.) And the fourth sentence makes clear that even if the agency finds insufficient evidence to act on a complaint, "you have the right to make the complaint and have it investigated if you believe an officer behaved improperly." (*Ibid.*, capitalization omitted.) This is not a message of deterrence. The advisory, in plain language, properly distinguishes between a good-faith complaint that lacks "enough evidence" and "a complaint that you know to be false." (*Ibid.*, capitalization omitted.) The court worries that "the admonition requirement may well deter reporting by persons who merely *suspect*, but cannot be certain, that they were a victim of more subtle forms of police misconduct such as racial profiling or an unlawful stop." (Maj. opn., *ante*, at p. 44.) But why? A person who genuinely suspects but is not certain she was a victim of police misconduct would readily know that she is not making a complaint she knows to be false.

Indeed, people throughout California, including people in jurisdictions that require the advisory, have not been deterred from filing thousands of complaints that were investigated and determined to be "unfounded" (allegation is not true), "exonerated" (officer did not violate the law or agency policy), or "not sustained" (evidence is insufficient to prove or disprove the allegation). (Racial & Identity Profiling Advisory (RIPA) Board, Annual Report 2020, p. 60 (RIPA 2020 Report).) For example, among 8,488 complaints resolved by 453 agencies in 2018, when the admonition was widely used, a total of 7,569, or 89%, resulted in one of those three dispositions. (*Ibid.*; see RIPA Board, Annual Report 2018, p. 28 [reviewing complaint forms from 85 agencies and finding that 63% "included language informing the civilian of his/her right to file a complaint and many featured [the advisory] language" and that 81% "include a line for the complainant's signature, typically to confirm that they have read and understand the [advisory] statement"].) Sure, California is a big state (maj. opn., *ante*, at p. 63), but unless there is reason to think those thousands of complainants are outliers — and the court offers none — this strikes me as probative of whether the advisory poses a risk of deterring "the average person" from making a good-faith complaint (*id.* at p. 62).

The court adds atmosphere to the advisory by positing that "subdivision (a)(2) requires that: (1) complainants walk into a police station and locate the appropriate person to complain to, who will likely be a uniformed police officer; (2) complainants make known that they want to levy a serious complaint of misconduct against one of the colleagues of the person they are complaining to; (3) complainants will then be

told that before the police will even accept a complaint, they must sign an advisory acknowledging that they can be criminally charged if law enforcement believes that anything they say is knowingly false; and (4) the entity that will make a determination of falsity for purposes of effectuating an arrest is, in the first instance, likely to be the very entity that the person is complaining about." (Maj. opn., *ante*, at p. 44.)

This narrative does not track reality in several respects. For one thing, the statute does not "require[]" anyone to "walk into a police station." (Maj. opn., *ante*, at p. 44.) On a cursory search of complaint procedures throughout the state, it is evident that there are many ways to file a complaint. Among the eight largest jurisdictions that give the advisory — Alameda County, Kern County, Riverside County, Sacramento County, San Bernardino County, City of San Diego, San Diego County, and Ventura County — none requires complaints to be filed in person. (See Appendix, *post* [collecting websites on these jurisdictions' complaint procedures].) All of them provide options such as filing online or by e-mail, mail, or phone. The Los Angeles Police Department "encourages" in-person filing but makes clear "it is not required"; a complaint may be filed online or by phone, mail, fax, e-mail, mobile app, or even Facebook or X. (*Ibid.* [Los Angeles websites].) Although some agencies require an in-person interview for a filed complaint to go forward, today's opinion does not identify a single jurisdiction that requires complaints to be filed in person. (See RIPA 2020 Report, *supra*, pp. 88–90 [summarizing complaint procedures in eight large jurisdictions; none requires filing in person].)

Moreover, it is inaccurate or at best oversimplified to say that complaint procedures put people in the position of levying

"a serious complaint of misconduct against one of the colleagues of the person they are complaining to," or that the entity assessing the merits of a complaint is "likely to be the very entity that the person is complaining about." (Maj. opn., *ante*, at p. 44.) In this day and age of professional policing, law enforcement agencies commonly have structures designed to protect the integrity of investigations. (See RIPA 2020 Report, *supra*, pp. 88–90.) An easy search reveals that complaints against officers of the San Diego Police Department are handled by the Internal Affairs Unit. In Sacramento County, complaints are filed with the Internal Affairs Bureau of the Sheriff's Office or with the county's Office of Inspector General. A complaint about a Los Angeles Police Department officer may be filed with the department or with the Office of the Inspector General of the Los Angeles Police Commission. In San Francisco, complaints are handled by the Department of Police Accountability, an agency independent of the police department and staffed by "[c]ivilians who have never been police officers in San Francisco." (Appendix, *post* [collecting relevant websites].) These are but a few examples.

Today's opinion says a further concern is that "the language of subdivisions (a)(1) and (a)(2) introduces uncertainty and confusion as to the specific scope of statements that might fall within the criminal provision." (Maj. opn., *ante*, at p. 45.) The court says the term "misconduct" (§ 148.6, subd. (a)(1)) is vague and not defined. (Maj. opn., *ante*, at p. 45.) But doesn't that *increase* the latitude for citizens to make complaints in good faith? (See *People v. Nuckles* (2013) 56 Cal.4th 601, 611 [rule of lenity " 'generally requires that "ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the

benefit of every reasonable doubt on questions of interpretation" ' "].) The court also posits inconsistency between the statute and the advisory in that the advisory's "term 'improper police conduct' could be reasonably construed as encompassing a broader category of behavior than [the statutory term] 'misconduct.' [Citation.] And whereas subdivision (a)(1) makes clear that it is a knowingly false 'allegation of misconduct' that triggers the criminal sanction, the admonition in subdivision (a)(2) simply states it is a misdemeanor to file any 'complaint' that one knows to be false." (Maj. opn., *ante*, at p. 46.) To borrow a phrase: "This is wordplay." (*R. A. V.*, *supra*, 505 U.S. at p. 392.) Parsing the distinction between "improper conduct" and "misconduct," or between "allegation of misconduct" and "complaint," is a task (some) lawyers may love. But ordinary citizens giving words their ordinary meanings are not likely to be confused.

The court also says section 148.6, subdivision (a)(1) contains no requirement that "the false statement be material to the allegations at issue." (Maj. opn., *ante*, at p. 45.) But the statute does not punish any false statement in a complaint; it targets an "allegation of misconduct against any peace officer" that is made "knowing the allegation to be false." (§ 148.6, subd. (a)(1).) Statements extraneous to the allegation of misconduct are not covered. The same meaning is conveyed by the admonition that you can be prosecuted "if you make a complaint against an officer knowing that it is false." (*Id.*, subd. (a)(2), capitalization omitted.) An ordinary person giving words their ordinary meanings would know that statements unrelated to one's "complaint against an officer" are not covered.

If there were real confusion or uncertainty concerning the statute's coverage, one would expect to find cases where defendants convicted under the statute challenged its scope or the sufficiency of the evidence. But none of the cases cited in today's opinion addressed such issues. (See *People v. Stanistreet* (2002) 29 Cal.4th 497; *Chaker, supra,* 428 F.3d 1215; *Hamilton v. City of San Bernardino* (C.D.Cal. 2004) 325 F.Supp.2d 1087; *Hamilton v. City of San Bernardino* (C.D.Cal. 2000) 107 F.Supp.2d 1239 (*Hamilton*); *Cuadra, supra,* 2010 WL 55875.) There is one case where an appellate court noted that the trial court dismissed a section 148.6 prosecution for lack of evidence. (*Grassilli v. Bar* (2006) 142 Cal.App.4th 1260, 1268; see *id.* at pp. 1283–1284 [finding "substantial evidence" that the section 148.6 charge against Grassilli was "objectively baseless" in the context of affirming a jury verdict that officers had retaliated against Grassilli for reporting their misconduct].) I am aware of no other case law.

And if the statute deters "truthful (or at least well-intentioned) complaints" (maj. opn., *ante,* at p. 6), one would expect to find evidence that good-faith complainants are in fact deterred. But the only actual instance of deterrence cited in today's lengthy opinion is the *Hamilton* case. (Maj. opn., *ante,* at p. 68, fn. 21.) There, two officers "pulled [Hamilton, an African American man,] off his bicycle, searched him and handcuffed him. One of the officers grabbed [Hamilton] around the throat, kicked his legs out from under him, landed on top of him, and placed a knee in his chest while continuing to choke him." (*Hamilton, supra,* 107 F.Supp.2d at p. 1240.) Hamilton was released "after signing a citation for not having a bicycle license." (*Ibid.*) When Hamilton went to file a complaint against

the officers, "[t]he watch commander at the station gave [him] a complaint form and told [him] that if he knowingly filed a false complaint, he could be prosecuted under [section 148.6]. The watch commander also told [Hamilton] that he had already talked to one of the officers out in the field who told him that [Hamilton] did not have any injuries. [Hamilton] displayed an injured wrist to the watch commander, and the watch commander responded that the injured wrist was the kind of injury which resulted from resisting arrest." (*Id.* at p. 1241.) Even if this egregious circumstance amounts to an unconstitutional application of section 148.6, it hardly supports invalidating the statute across the board.

The court notes that the RIPA Board has said section 148.6 "risks deterring reasonable citizens from coming forward with truthful complaints about police misconduct." (Maj. opn., *ante*, at p. 67.) Although the RIPA Board performs a valuable function, it is notable that the Board, which is tasked with conducting "evidence-based research" on various police practices (§ 13519.4, subd. (j)(3)(D)), has cited no evidence in any of its eight annual reports to support the claim of deterrence — no community surveys, no declarations from affected individuals, no examples from case law or even the media.

It is not clear what facts support the assertion that section 148.6 creates "a risk" of deterrence. (Maj. opn., *ante*, at p. 66.) What is clear is that thousands of ordinary people have filed unfounded complaints notwithstanding the statute and its advisory. The court says this "tells us little about how many people may have been deterred from filing complaints in the first instance." (*Id.* at p. 63.) But that just restates the speculative thesis. Against the undisputed fact that thousands

17

have not been deterred, the court does not say "how many people may have been deterred." It cannot even offer a rough estimate.

There are many reasons people might be deterred from filing a complaint against the police (*ante*, at p. 4), but there are no facts showing that section 148.6 is such a reason. This statute has been on the books for three decades. If it were genuinely confusing or suppressive of good-faith complaints, surely there would be some objective indicators to that effect by now. There may be scenarios, as in *Hamilton*, where the statute is wielded in a manner that makes it unconstitutional as applied. (Cf. maj. opn., *ante*, at pp. 43–45 [conjuring police station scenarios].) But that depends on the circumstances. Speculative assertions of a chilling effect, without facts, do not suffice to entirely jettison the statute on free speech grounds.

## IV.

Finally, it is worth noting that complaints alleging misconduct by a peace officer are generally confidential. (§ 832.7, subd. (a); see *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 710–711 [discussing process for discovery of an officer's personnel files pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531].) There are exceptions for some categories of alleged misconduct and for sustained findings of specific types of misconduct; such records are subject to disclosure under the California Public Records Act. (§ 832.7, subd. (b)(1).) Yet disclosable records may be redacted for various reasons (*id.*, subd. (b)(6)), including "where, on the facts of the particular case, the public interest served by not disclosing the information clearly outweighs the public interest served by disclosure of the information" (*id.*, subd. (b)(7)). And for certain disclosable records, an agency may withhold the records for up to 60 days

(and sometimes longer) from the date of the alleged misconduct pending an active investigation.  (*Id.*, subd. (b)(8).)  What this means is that the vast majority of complaints are confidential. (Cf. RIPA 2020 Report, *supra*, p. 60 [10.8% (919) of complaints statewide that reached a disposition in 2018 were "sustained"; 49.1% (4,167) were "unfounded," 27.2% (2,308) were "exonerated," and 12.9% (1,094) were "not sustained"].)  And some that are not confidential may be withheld for months after the alleged misconduct occurred.

Against this backdrop, even if section 148.6 deters some good-faith complaints (and I doubt it does), it seems odd to conclude that the statute "raises substantial risks to the marketplace of ideas." (Maj. opn., *ante*, at p. 39, italics omitted.) How can section 148.6 distort the marketplace of ideas when the vast majority of complaints, including those hypothetically deterred, are by law not disclosable and thus not part of the marketplace at all?  The court seems to imply the statute especially deters *meritorious* complaints (maj. opn., *ante*, at pp. 6, 39, 45, 53, 56, 75 ["truthful" complaints]), which can result in disclosure.  But that seems implausible when thousands of people, including people required to sign the advisory, have not been deterred from filing complaints ultimately deemed "unfounded," "exonerated," or "not sustained."  And even disclosable complaints are not readily accessible; a Public Records Act request is required.  To the extent the statute deters good-faith complaints at all, removing the deterrence would simply enlarge confidential personnel files while adding little to the marketplace of ideas.

Meanwhile, everyone agrees that section 148.6 does nothing to deter people from publicizing good-faith or bad-faith

allegations of police misconduct in whatever way they wish. They can post on social media. They can write an op-ed. They can go on cable news. They can organize a protest. Although the law of defamation may set limits, none of this expressive activity is affected by section 148.6, which governs an official complaint process. If there are barriers to accessing the process, perhaps those barriers could give rise to a claim under the right to "petition government for redress of grievances." (Cal. Const., art. I, § 3, subd. (a); see U.S. Const., amend. I.) But that has little to do with the marketplace of ideas concerning police misconduct.

In sum, the Legislature's sensible effort to protect the complaint process from intentional abuse is fully compatible with the right to free speech. I respectfully dissent.

**LIU, J.**

## APPENDIX

Below are websites providing information about the complaint procedures in various police jurisdictions discussed in the dissenting opinion.  These Internet citations are current of November 10, 2025, and are archived by year, docket number, and case name at <http://www.courts.ca.gov/opinions/cited-supreme-court-opinions>.

- Alameda County Sheriff's Office, Citizen Complaint <https://www.alamedasheriff.gov/community/citizen-complaint>
- Kern County Sheriff's Office, Complaints <https://www.kernsheriff.org/complaints>
- Los Angeles Police Dept., Report Employee Misconduct, <https://www.lapdonline.org/office-of-the-chief-of-police/professional-standards-bureau/report-employee-misconduct/>
- Office of the Inspector General, Los Angeles Police Commission, How to File a Complaint, <https://www.oig.lacity.org/how-to-file-a-complaint>
- Riverside County Sheriff, Complaints <https://www.riversidesheriff.org/301/Complaints>
- Sacramento County Sheriff's Office, Internal Affairs Bureau <https://www.sacsheriff.com/pages/professional_standards_division_internal_affairs.php>
- San Bernardino County Sheriff's Department, Parking Citations, Commendations, and Complaints <https://wp.sbcounty.gov/sheriff/divisions/citizen-complaint-procedure/>
- City of San Diego, Police, File a Complaint <https://www.sandiego.gov/police/contact/file-complaint>

- San Diego County Sheriff's Office, Commendations & Complaints <https://www.sdsheriff.gov/i-want-to/file/commendations-complaints>
- City and County of San Francisco, About the Department of Police Accountability <https://www.sf.gov/departments--department-police-accountability--about>
- Ventura County Sheriff's Office, Citizen Complaint Form <https://sheriff.venturacounty.gov/citizen-complaint-form/>

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Los Angeles Police Protective League v. City of Los Angeles

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 78 Cal.App.5th 1081
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S275272
**Date Filed:** November 10, 2025

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert Broadbelt III

_____

**Counsel:**

Michael N. Feuer and Hydee Feldstein Soto, City Attorneys, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Chief Assistant City Attorney, Blithe S. Bock, Assistant City Attorney, and Michael M. Walsh, Deputy City Attorney, for Defendants and Appellants.

Hanson Bridgett, Adam W. Hofmann and David C. Casarrubias for the League of California Cities as Amicus Curiae on behalf of Defendants and Appellants.

Peter Eliasberg; American Civil Liberties Union Foundation, Laura Moraff; Cooley, Kathleen R. Hartnett, David S. Louk, K.C. Jaski, Adam S. Gershenson, Matt K. Nguyen and Ryan Liu for the American Civil Liberties Union of Southern California, the American Civil Liberties Union of Northern California, Black Lives Matter–Los Angeles, Check the Sheriff, First Amendment Coalition and JusticeLA Coalition as Amici Curiae on behalf of Defendants and Appellants.

Rains Lucia Stern St. Phalle & Silver, Richard A. Levine and Michael A. Morguess for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael M. Walsh
Deputy City Attorney
200 North Spring Street, 14th Floor
Los Angeles, CA 90012
(213) 978-2209

Matt K. Nguyen
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 728-7123

Michael A. Morguess
Rains Lucia Stern St. Phalle & Silver, PC
16130 Ventura Boulevard, Suite 600
Encino, CA 91436
(747) 221-7101